INTERNATIONAL & G. N. RY. CO. v. ED-MUNDSON. (No. 5598.)*

(Court of Civil Appeals of Texas. San Antonio. March 8, 1916. Rehearing Denied April 26, 1916.)

1. LIBEL AND SLANDER ⊙⟞45(2)—PRIVILEGED COMMUNICATION.

Letter from the superintendent of a railroad to the superintendent of an express company, asking discharge, for stated reason, of one employed by the express company as express messenger, but who also handled the baggage of the railroad company, which repaid the express company part of his salary, was a privileged communication.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 139; Dec. Dig. ⊙⟞45(2).]

2. LIBEL AND SLANDER ⊙⟞112(2)—PROOF OF MALICE.

Malice, as an essential ingredient of libel, may be proven directly, or by inference from the character of the libelous document, or by circumstantial evidence.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 329; Dec. Dig. ⊙⟞112(2).

3. LIBEL AND SLANDER ⊙⟞51(1)—PRIVILEGED COMMUNICATION—EXPRESS MALICE.

To make a libel actionable, in case of a privileged communication, express malice must be shown.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 149; Dec. Dig. ⊙⟞51(1).]

4. LIBEL AND SLANDER ⊙⟞112(2) — EXPRESS MALICE—EVIDENCE.

While express malice, necessary in case of a privileged communication, cannot be inferred from the letter being false and injurious, it can be shown by circumstantial evidence.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 329; Dec. Dig. ⊙⟞112(2).]

5. LIBEL AND SLANDER ⊙⟞112(2) — EXPRESS MALICE—RECKLESS STATEMENT.

That a false statement was made with reckless disregard of whether it was true or false would authorize a jury finding express malice.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 329; Dec. Dig. ⊙⟞112(2).]

6. LIBEL AND SLANDER ⊙⟞123(6) — EXPRESS MALICE—PROOF.

In case of a privileged communication, slight evidence of malice entitles plaintiff to have his case submitted to the jury.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 363; Dec. Dig. ⊙⟞123(6).]

7. LIBEL AND SLANDER ⊙⟞123(6) — EXPRESS MALICE—RECKLESS STATEMENT—EVIDENCE.

Evidence of the making of a charge against plaintiff, constituting a privileged communication, with a reckless disregard or whether it was true or false, held sufficient to go to the jury on the question of express malice.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 363; Dec. Dig. ⊙⟞123(6).]

8. RAILROADS ⊙⟞258 — LIABILITIES ASSUMED BY PURCHASER—"PERSONAL INJURY."

Injury to character or good name, through libel, is "personal injury" within Rev. St. 1911, arts. 6624, 6625, whereby the purchaser of a railway is charged with payment of subsisting liabilities and claims for death and personal injuries sustained in the operation of the road (citing Words and Phrases, Personal Injury).

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 799–801; Dec. Dig. ⊙⟞258.]

9. RAILROADS ⊙⟞258 — LIABILITIES ASSUMED BY PURCHASER—INJURY SUSTAINED IN "OPERATION OF RAILROAD."

The injury sustained by an express messenger employed by an express company, but who also handled baggage of the railroad company, which paid the express company part of his salary, when on a false accusation by the superintendent of the railroad to the superintendent of the express company that he carried a passenger in the baggage car he was discharged, was "sustained in the operation of the railroad," within Rev. St. 1911, arts. 6624, 6625, so as to make the purchaser of the railroad take it subject to liability therefor.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 799–801; Dec. Dig. ⊙⟞258.

For other definitions, see Words and Phrases, First and Second Series, Operate.]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Action by O. O. Edmundson against the International & Great Northern Railway Company and another. Judgment for plaintiff, and defendant named appeals. Affirmed.

Wilson, Dabney & King, of Houston, and F. C. Davis, J. M. Eskridge, and Cobbs, Eskridge & Cobbs, all of San Antonio, for appellant. Ernest Fellbaum, Claud J. Carter, Perry J. Lewis, Champe G. Carter, Randolph L. Carter, and H. C. Carter, all of San Antonio, for appellee.

CARL, J. Appellee, Edmundson, sued T. J. Freeman, receiver of the International & Great Northern Railroad Company, and the International & Great Northern Railway Company, successor in ownership to the properties of the first-named railroad company, for damages on account of an alleged libelous letter written by one El. Martin, superintendent of the railroad under Freeman, receiver, to T. N. Edgell, superintendent of the Pacific Express Company, by which last-named company Edmundson was employed. Appellee was employed by the express company as express messenger, and he also handled the baggage of the railroad company; and, while he was employed by the express company and paid by it, he performed a joint service for the express and railroad companies, and the railroad company repaid to the express company a part

of his salary. While so employed, a negro detective, one Arthur Parrish, working for the George A. Fields Detective Agency of St. Louis, Mo., sent in a report on July 26, 1910, to D. P. Peterson, an officer of the detective agency at St. Louis, in which it was charged that Edmundson had permitted Parrish to ride on baggage car No. 30, International & Great Northern train No. 6 on that date after Parrish had told appellee he had paid the porter. When this report was made, the following correspondence took place, as a result of which Edmundson was discharged from the express company's service, and which is made the basis for this suit for libel:

"International & Great Northern Railroad Company.

"H. Martin, Superintendent.

"Palestine, Texas, Oct. 22, 1910.

"Mr. T. N. Edgell, Superintendent Pacific Express Co., Dallas, Texas—Dear Sir: Will you please relieve joint express and baggageman, W. V. Butrell, from service on this line, on account of carrying passenger in baggage car on train 9 July 21, and relieve O. O. Edmundson [meaning plaintiff] from joint service on account of carrying passenger in baggage car on No. 6, arriving Palestine July 26th.

"Please favor me with your reply.

"Yours truly,　　[Signed] H. Martin."

"The Pacific Express Company.

"Superintendent's Office, Texas Division.

"T. N. Edgell, Superintendent.

"Dallas, Texas, November 15, 1910.

"Mr. O. O. Edmundson, % Y. M. C. A., San Antonio, Texas—Dear Sir: This is to acknowledge receipt of your letter of November 14th. You were relieved from the service because you carried a man in your car without authority.

"Yours truly,

"[Signed] T. M. Edgell, Superintendent."

"The Pacific Express Company.

"Superintendent's Office, Texas Division.

"T. N. Edgell, Superintendent.

"Dallas, Texas, December 20, 1910.

"Mr. O. O. Edmundson, % Pacific Express Co., San Antonio, Texas—Dear Sir: Referring to your letter of December 15th, I inclose you a copy of a letter written me by H. Martin, superintendent of the I. & G. N. Railroad, on October 22d.

"Yours very truly,

"[Signed] T. N. Edgell, Superintendent."

"The Pacific Express Company.

"Superintendent's Office, Texas Division.

"T. N. Edgell, Superintendent.

"Dallas, Texas, January 17, 1911.

"Mr. O. O. Edmundson, San Antonio, Texas— Dear Sir: This is to acknowledge receipt of your letter of January 14th, and, as I have advised you, you were relieved from the service of this company because it was reported that you carried a man in your car without authority, which is a violation of the rules of the railway as well as this company.

"Yours truly,

"[Signed] T. N. Edgell, Superintendent."

When Superintendent Edgell, of the express company, received Martin's letter, he communicated the same to Beatty, who was immediately in charge of such employés as appellee, and directed his discharge, which was forthwith carried out by Beatty.

It was alleged that the carrying of a passenger in a baggage car was a serious breach of discipline and a serious charge against the messenger's character for honesty and fidelity to duty, it being equivalent to saying that he had permitted such passenger to ride there for pay, which the messenger retained, and that express companies and railway companies, as well as other large industrial concerns, operated under a system whereby a man was required to furnish a certificate as to his last employment before he would be given work with a new concern, and, if that report were bad, he could not obtain employment from any of the companies or industrial enterprises operating under said system; and that all such concerns for which appellee was suited by training to work did operate under that system, which put employment for which he was suited beyond his reach, on account of the bad report which would be given him.

The appellant answered and interposed various exceptions and pleas, but we think we need only confine ourselves largely to the two controlling questions in the case, that is to say: (1) Whether the letter written by Martin was a privileged communication, and, if so, was there express malice shown; (2) Whether this cause of action comes within the terms of what is known as the I. & G. N. Bill (Rev.' Stats. 1911, arts. 6624 and 6625). The portion of article 6624 applicable to this cause is, when a railway shall be sold, the purchaser shall take the same "charged with and subject to the payment of all subsisting liabilities and claims for death and personal injuries sustained in the operation of the railroad by the sold-out company and by any receiver thereof." Article 6625, giving new railway corporations the right to buy and take over such sold-out railways, carries with it the same proviso as that above quoted.

[1] Let us then consider first whether this communication is privileged; and in following this order of investigation we are not attempting to follow that set forth in the briefs. If this letter comes within the class of privileged communications, it would fall under that head called a qualified privilege, unless it was done with malice; that is, to "communications made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation." Newell on Slander and Libel, § 493. This letter was written by Martin, of the railroad company, to Edgell, who held a similar position with the express company, and not only one, but both, of them, were interested in Edmundson's employment. There is no doubt in our minds that the communication was privileged.

[2, 3] While malice is an essential ingredient of libel, there are different ways of showing this element. It may be proven directly, or may be inferred from the character of the libelous document, or may be proven by circumstantial evidence. Indeed, direct positive proof 'is rarely obtainable. But, where the subject-matter of the libel is privileged, express malice must be shown before the libel is actionable.

In Behee v. Railway Co., 71 Tex. 428, 9 S. W. 449, Judge Collard said:

"Malice is a necessary ingredient of libel. When a defamatory and false publication is made by one person of another, malice will be imputed to the act; but, where the publication is privileged and is believed to be true, the prima facie case of libel so made is deemed to have been fully met; and then to sustain the action malice must be shown to exist by other evidence as by the style or manner of the writing or by extraneous facts. These principles were clearly announced by Associate Justice Roberts in the well considered case of Holt v. Parsons, 23 Tex. 21 [76 Am. Dec. 49]."

Further on, in the same case, it is said:

"Such questions of malice should be left to the jury. If a privileged communication, though false, is believed to be true by the publisher, and the language used to express the communication is not unnecessarily disparaging, and it is not shown by extraneous evidence to have been actuated by a malicious intent to injure, there can be no recovery; but if one whose duty or privilege it is to give information concerning the character of another defames his character or states facts not actionable per se, but which become actionable from the injurious consequences resulting therefrom, knowing the same to be false, the bad intent or motive necessary to sustain the action may be inferred. A master does not have the right to libel his servant simply because the relation of master and servant exists, or had existed, by making false and injurious publications concerning his character. The jury may infer bad motive from the fact that the publication was false and injurious."

[4, 5] The last statement in the quotation, that the jury may infer bad motive from the fact that the publication was false and injurious, does not obtain where the communication is privileged; but there express malice must be shown. And, as we have said, of this the jury shall judge, and the evidence to support such a verdict may be circumstantial. The mere proving the falsity of the libelous statement, however, would not be sufficient to sustain a finding of express malice. If a false statement is made with a reckless disregard of whether it be true or false, that would be sufficient evidence upon which a jury could find express malice.

[6, 7] Let us, then, see what the evidence is in this case as to the existence of malice, and in this connection it will be borne in mind that in case of a privileged communication slight evidence of malice entitles the plaintiff to have his case submitted to the jury. 25 Cyc. 524; Cranfill v. Hayden, 97 Tex. 544, 80 S. W. 609.

The reason appellee was discharged was that a negro detective from St. Louis claimed to have paid the porter $2 to ride on the baggage car from San Antonio to Palestine, which fact of payment the negro says he told Edmundson, and was permitted to ride. Apparently without any investigation whatever as to whether the negro's statement was true or false, Martin wrote the letter to Edgell peremptorily ordering appellee's discharge for the reason, as stated, that he had carried a passenger in his car. The only inference was that he not only was breaking the rules of the companies, and was therefore unfaithful to his trust, but was so carrying a passenger for pay—a charge of dishonesty—a charge which could mean nothing else, notwithstanding all the testimony that it was not a reflection on his honesty. When a man is called a thief, all the testimony in Christendom to the contrary would not show the man's honesty was not brought in question. Edmundson says he did not carry a passenger in his car. He knew Martin, and saw him every few days in Palestine; sometimes Martin would speak, and sometimes he would not. His attitude was cool and distant towards appellee. After the discharge appellee wrote Martin about it and received no answer. He then went to see Martin twice to get him to investigate the charge. And what was the result? He treated Edmundson cool, and said he could not do anything for him. He would not discuss it at all. This was the first time appellee went. Two weeks later appellee went back and begged Martin to investigate, and told him the charge was false.

"He just told me that that was all there was to it; he wouldn't have anything more to do. I told him I was innocent, didn't know anything about it, didn't carry this party, that there was a mistake somewhere, and that I would like for him to investigate the charge. He said he was through with it, didn't have any time to talk to me anything about it, and waved me out. He never at any time gave me an investigation. * * * He told me he would not touch the matter, would not investigate it, and waved me out."

Beatty had told appellee that, if he would go and straighten the matter up with Martin, he would put him back on his run. This he tried to do, with the result above shown. He says he never did anything to incur Martin's displeasure. Another man discharged about the same time and for a similar offense was put back to work.

So here we have a young man who had always enjoyed a good reputation, and who had worked himself up in his business from a salary of $45 per month to $90 per month, with a reasonable hope of further advancement, absolutely destroyed in his chosen avocation by a letter of Martin, based upon nothing more substantial than a detective's report. His honesty is attacked, his reputation blasted and destroyed, and he is kicked out of service with this libelous record perpetuated against him to forever preclude—at least seriously hamper him—from obtaining similar service; for it is shown that in these matters of public service corporations letters of service from the last preceding employer

are almost, if not entirely, a prerequisite to obtaining a new employment. And the wails of the damned are not more unavailing than were the demands of this young man to have his character vindicated at the hands of this man Martin, who waved him aside and closed the door of hope in his face. Was there a reckless disregard of whether this charge was true or false? Undoubtedly the jury was warranted in concluding that there was. Petty officials are sometimes prone to get such an exalted idea of their own importance that the character of those below them weighs as naught against those ideas; but it must ever be recalled that the master is responsible for the kind of men placed in authority and for their acts done in the scope of the authority delegated.

In Railway Company v. McArthur, 31 Tex. Civ. App. 205, 72 S. W. 76, Judge Key said:

"The evidence tending to show express malice may not be strong, but we cannot say that there was no testimony tending to establish that fact. The arbitrary action of the defendant's agent, Le Baume, in refusing to answer the plaintiff's letters, denying charges made against him, and explaining what he was doing, and the conduct of the agent in proceeding at once to make the publication complained of, tended to show gross indifference to the plaintiff's rights, and the perpetration of a wanton, if not willful, wrong."

[8] So we come to the second inquiry as outlined above: Does the I. & G. N. Bill cover this case, or is damage to reputation such character of claim as comes within the term personal injury? If this is a personal injury, was it sustained in the operation of the railroad?

In Houston Printing Company v. Dement, 18 Tex. Civ. App. 30, 44 S. W. 558, in which case a writ of error was denied by the Supreme Court, it is said:

"Under the appellant's first assignment of error it is insisted that the action in this case died with the original plaintiff, and that trial court erred in not so holding, and that the act of May 4, 1895, entitled 'An act to provide for the survival of causes of action for personal injuries, other than those resulting in death, and for the enforcement thereof,' is, so far as it includes injuries to the health or to the reputation of the injured party, unconstitutional and void, in that the subject of injuries to the health or to the reputation of the injured party is not indicated by or expressed in the title or caption to the act. The question is presented with much force in appellant's brief, but we are constrained to dissent from his proposition, and to hold that libel and slander are included in the term 'personal injuries,' and that therefore injuries to the reputation are indicated by the caption of the act of May 4, 1895. That injuries to the physical man are generally meant by the expression 'personal injuries' may be conceded, but it is nevertheless true that injuries to the reputation and to the health have ever been classed and treated by law writers as personal injuries. The absolute rights of each individual are the rights of personal security, the right of personal liberty, and the right of private property. Injuries which affect the personal security are injuries against the life, the limb, the body, the health, or the reputation of the individual."

And we quote the following from Sanderson v. Hunt, 116 Ky. 435, 76 S. W. 179, 3 Ann. Cas. 168, a Kentucky case:

"In volume 2, p. 118, Bl. Comm. (Cooley), under the head of 'Injuries Affecting Personal Security,' he says: 'As to injuries which affect the personal security of individuals, they are either injuries against their lives, their limbs, their body, their health, or their reputation.' All these, as is each of them, are injuries to the person. The act of Congress must be understood as having used the words in the section quoted with reference to their common-law acceptation. Sutherland on Statutory Construction, 289. An injury to one's person may be done in a number of ways. For example, it may be done to some member of his body; it may be to his health; it may be to his sense of feeling; it may be to his state or peace of mind. Any injury done to him that wounds him in any of these parts is essentially a personal injury—that is, an injury to his person; an injury to that which constitutes a part of his person. The law may not allow a recovery for all of such injuries, but for such as it does allow a recovery for it may be classed generally as a recovery for a personal injury."

In Words and Phrases, vol. 6, p. 5341, we find:

"A personal injury includes libel, slander, criminal conversation, seduction, and malicious prosecution; also an assault, battery, false imprisonment, or other actionable injury to the person, either of the plaintiff or another."

Whether the term extends this far is not necessary for us to say. A person is composed of two elements, as we have always understood, viz., mind and matter, or material and immaterial things. As to which is the more important, we scarcely need discuss; for an injury to the body may heal and the body resume its normal condition, but an injury to character, to the vital moving force of a man—to the real man—may not be healed. The wound in the first instance is buried with the body and is separated again into the material elements composing it; but in the other it may survive as a curse to those who follow. Injury to character or good name is a personal injury.

[9] And it will not do to say that this man was not engaged in operating the railroad. It was just as necessary that the express and baggage be carried as it was that a passenger be hauled. This messenger was performing a part of the service just as necessary to operate the road in its way, as was the engineer or the conductor. It was all a part of the service in which the railroad was engaged.

The judgment is affirmed.