Nos. 14,348, 18,349.

AMERICAN INSURANCE COMPANY ET AL. *v.* NAYLOR.
(87 P. [2d] 260)

Decided January 30, 1939.   Rehearing denied February 20, 1939.

Messrs. Berman & Holland, Mr. Joseph N. Lilly, Mr. Otto Friedrichs, of counsel, for plaintiffs in error.

Messrs. Smith, Brock, Akolt & Campbell, Mr. R. A. Dick, for defendant in error.

*En Banc.*

Mr. Justice Young delivered the opinion of the court.

Defendant in error Naylor instituted two actions against plaintiffs in error in the district court of Boulder county. In the first he sought damages for the death of his wife resulting from an automobile accident, occasioned, as he alleged, by the negligence of plaintiffs in error. In the second he asked judgment for the loss of her services and companionship during the period intervening between the accident and her death and for the amount of expenditures for hospital and medical services made necessary by the injuries sustained by the wife in the accident, for funeral expenses, and for exemplary damages. The cases were consolidated for trial and verdicts returned in favor of the plaintiff in each. On the

overruling of the motions for new trial and entry of judgments on the verdicts, plaintiff requested that interest on the amounts awarded be included in the judgments, which request was by the court denied. The judgments are here for review upon assignments of error by defendants to the judgments against them, and on cross assignments of plaintiff based upon the court's refusal to allow him interest.

In the circumstances presented we deem it desirable to consider the cases together; accordingly disposition will be made of both by this opinion.

The evidence with respect to the occurrence of the accident is substantially as follows: On October 23, 1934, the plaintiff was taking his wife from Longmont, where they resided, to Denver to remain at the home of his parents where she might be under the care of a physician the remaining period of her pregnancy which was then some five months advanced. They were proceeding southerly in a Nash automobile driven by plaintiff's brother on highway 285 from Longmont to Denver following about 200 feet behind a Ford car that was travelling at a rate of about 35 to 40 miles per hour. At a point just north of where a road leaves the main highway and runs easterly to the town of Erie, the Ford slackened its speed and the driver signalled he would make a left turn. The driver of the Nash reduced the speed of his car, but not quite as rapidly as did the Ford driver, thus lessening somewhat the distance between the two. As the driver of the Nash observed the signal, he noticed also a DeSoto car driven by defendant Reams proceeding northerly along the highway at a point about an eighth of a mile away at a speed of fifty-five to sixty miles an hour. About a hundred sixty feet south of the intersection of the roads the DeSoto began to swerve from one side of the road to the other and went off and on the pavement three or four times. Just as the Ford entered the branch road the DeSoto turned diagonally across the pavement to the west side directly in front of the Nash car, which

was then moving very slowly, if it had not come to a standstill, and at a point 18 feet north of the north line of the intersection the right side of the DeSoto at a point just back of the front right fender collided violently with the front part of the Nash. After the collision the Nash was left facing in a southwesterly direction partly on and partly off the pavement, the DeSoto facing due south in the borrow pit, parallel with and against the fence on the west side of the road. The pavement at the intersection bore marks left by a "terrific skid" of such force that the rear wheels of the DeSoto in the gravel on the east shoulder propelled a rock with sufficient force to break a glass in the door of the Ford car. The visible black skid marks on the pavement began at a point 195 feet south of the point of impact, and "grew more intense" as they approached the intersection. There were "195 feet of skidding marks, skidded a good part of the way." The driver of the Ford car had his arm out of the car making a signal for a left turn and had pulled over into the middle of the road for a hundred yards before he turned. There were no vehicles between the DeSoto and Ford cars and no mist or fog to obscure vision. While there was no bright sunlight, visibility was good. Notwithstanding these conditions Reams, the driver of the DeSoto, says he did not know the Ford was going to turn into the Erie road until he "saw the front wheels turning." If the driver of the Ford car began signalling for a left turn and pulled into the middle of the road a hundred yards before coming to the intersection it was a question for the jury to determine whether a man driving at a rate of fifty-five to sixty miles an hour—approximately 75 to 90 feet per second—in the exercise of ordinary care should have seen the Ford car in the middle of the road and the signal for a turn before the front wheels of the latter actually began to make the turn, and so seeing whether he should not have sooner applied his brakes so as to bring his car under control.

Assuming as an abstract proposition of law that

the contention of defendants that they were entitled, under the authority of *Denver City Tramway Co. v. Gustafson*, 21 Colo. App. 478, 121 Pac. 1015; *Pawnee Co. v. Powell*, 76 Colo. 1, 227 Pac. 836, and other cases cited, to have the jury instructed that if the testimony introduced by plaintiff disclosed contributory negligence on the part of himself or his agent, that defendant was relieved from showing contributory negligence by his evidence, the failure so to instruct was not error in this case. The remarks of the trial judge in ruling on the motion for a new trial were pertinent, and his determination of the above mentioned contention was correct. He said: "Well, there is a possibility of construing our Instruction No. 8 as possibly meaning that the defendant must produce the evidence. I don't think that is either to be followed as of necessity or as a logical interpretation. The only error in Instruction No. 8 was not prejudicial, but if the verdict of the jury had been the other way I think it would have been prejudicial to have submitted the question of contributory negligence or last clear chance to the jury. I don't believe there was any warranty for that."

There are but two other questions raised by the assignments of error that we deem it necessary to determine.

1. Is the evidence sufficient to show that Reams, at the time and place of the accident, was acting within the scope of his authority as agent of his codefendant, the American Insurance Company, so that his acts of negligence may be imputed to his principal? 2. Is the evidence sufficient to show that the accident was the proximate cause of the death of plaintiff's wife?

The testimony with respect to the first issue fairly tends to show the following facts: That Reams was the manager of the Rocky Mountain division of the American Insurance Company. The company was engaged in writing fire insurance through agents in various parts of Colorado. Lawrence E. Falls, who was with Reams in the car at the time of the collision, was a vice president of the company residing in the state of New Jersey, where

the insurance company had its home office. Mr. Falls had been on a business trip to San Francisco and on his return stopped in Denver to inspect the office of which Reams was manager, to observe the personnel employed, including Reams, and to ascertain any facts which might be of advantage to the company in its Denver offices. He stated that on this particular visit he was acting in a supervisory capacity and that it was for the purpose of an inspection for and on behalf of the company.

On the night of October 22, Mr. Falls was a dinner guest at the home of Mr. Reams and there they "planned to visit Rocky Mountain National Park the next day," as Mr. Falls had never been in the mountains about Denver. The car that they used for the trip was the property of the company, was intended by the company for the use of its general manager, and the expense of its maintenance and operation was paid by the company. Mr. Reams owned a car which was used by his wife and himself for their personal purposes. The expense of repairing the DeSoto car, approximately $100, rendered necessary by the collision, was paid by the company.

At the close of the testimony on behalf of plaintiff, consisting in part of a cross examination of defendant Reams and the introduction of a deposition given by Mr. Falls, defendants interposed a motion for nonsuit as to the American Insurance Company. In denying this motion the court held that there was sufficient evidence to go to the jury on the question of whether the defendant Reams was acting within the scope of his authority as manager for the company at the time of the accident and ruled accordingly. In ruling upon the motion the court referred particularly to one question and answer in the deposition of Mr. Falls which is as follows: "Q. What had been the particular occasion of your visit to Denver at this time? A. I had been previously on the Pacific Coast on a business trip and returning homeward I availed myself of the opportunity to stop for a day or so in Denver to

visit with Mr. Reams and other employees of the office and see the city of Denver and surrounding territory.''

We think the foregoing facts were sufficient to require a submission of the issue to the jury.

■ When the case was before this court after the first trial, *American Ins. Co. v. Naylor,* 101 Colo. 34, 70 P. (2d) 349, on substantially similar evidence the defendant insurance company asked that the district court be directed to enter a final dismissal of the cause as to the company. In passing upon this request we said: ''Counsel for the defendant corporation contends that the district court should be directed to enter a final dismissal of the case as to the corporation, but this cannot be done. Under the evidence in the record, the question whether the defendant company is or is not liable clearly remains an issue of fact.''

The liability of the company now has been determined adversely to its contention on sufficient competent evidence, and we are not authorized to disturb that finding.

The evidence with respect to the accident proximately causing the death of plaintiff's wife and, during the period intervening between the accident and her death, causing a loss of her services and companionship and necessitating expenses for her care, is substantially as follows: The wife of plaintiff before her marriage, February 12, 1934, had worked for three years at Bonner's Grocery store. She continued with her work there after her marriage until the middle of May of that year. She was a woman five feet seven inches tall and weighed a hundred and sixty pounds and was in excellent health. She was 24 years old. She became pregnant in the month of May. She was apparently normal for a woman in such condition until some time in the latter part of September or first of October, when she contracted a cold or influenza. Dr. F. C. Robb, the family physician for the Naylor family came to Longmont from Denver to see her about October 5, and again on the 9th and 19th. He visited her once between the 9th and 19th while passing through

Longmont on other business. Dr. Robb diagnosed her case as a bronchial cold. He directed her to remain in bed. She followed his directions for about a week after which she was up and down. He found her condition as to pregnancy apparently normal for that period. The next time Dr. Robb saw her was at the home of her husband's father in Denver on October 23, after the accident. He found numerous bruises on her arms and legs and that she was suffering from violent uterine contraction and in a pronounced state of shock. He diagnosed her condition as one of threatened abortion. A week or ten days after the accident he noticed a systolic heart murmur indicative of a damaged heart valve resulting from endocarditis, or inflammation of the lining of the heart muscle. This condition was acute. He stated that on his Longmont examinations he had observed a very faint murmur "not definite in its character enough to consider it an endocardial proposition." The acute condition arose a week or ten days after the accident. This condition grew progressively worse. The accident could be and probably was a cause of the transference from a mild chronic to an acute endocarditis. On November 21 the patient was removed to the hospital because of the possible occurrence of a miscarriage. On December 28th a caesarian operation was performed. The heart condition in conjunction with a faulty position of the foetus which indicated a prolonged labor, was one of the factors making the caesarian operation necessary. The child was delivered and lived; but the patient died January 29th from an embolism in the brain, which may be and frequently is caused by an acute endocarditis. Dr. G. G. Robb, who with his father was in constant attendance on the patient after the accident, gave it as his opinion that the endocarditis was caused by the trauma and shock resulting from the automobile accident; that the operation was necessitated by the heart condition and the position of the foetus, and that the endocarditis was the cause of the embolism.

There was testimony tending to contradict that of

the two physicians who attended Mrs. Naylor, which if believed by the jury, would have resulted in a verdict for the defendant. It is the function of the jury to determine the facts when the testimony is conflicting. It has done so in the present case and the evidence being sufficient and competent to support its findings they are binding on this court on review. It is to be noted that the jury was told in instruction No. 20 that though the embolism or acute endocarditis was the immediate cause of death, if they found that either or both proximately resulted from and was or were caused by the collision, that the collision would be deemed the proximate cause of the death. To the giving of this instruction there was no objection nor was any exception saved.

█ █ There remains for consideration the plaintiff's cross assignments of error challenging the refusal of the trial court to allow interest at the legal rate on the amount of the judgments from the date of the commencement of the actions, as prayed for in his complaints. Whether he is or is not entitled thereto depends on the construction to be given section 5, chapter 50, '35 C. S. A. which reads in part as follows: "In all actions brought to recover damages for personal injuries hereafter sustained by any person, resulting from or occasioned by the tort of any other person, corporation, association or partnership, whether by negligence or by willful intent of such other person, corporation, association of partnership, and whether such injury shall have resulted fatally or otherwise, it shall be lawful for the plaintiff in the complaint to claim interest on the damages alleged from the date said suit is filed." The terms used in this statute are comprehensive. They are applicable to *any* action brought to recover damages for personal injuries sustained by *any* person. The statute further provides that it is immaterial whether such injuries shall or shall not result fatally. In either case interest may be recovered. There is, of course, no difference in character between fatal and nonfatal injuries. The difference is only in

degree from which it follows that the title of the act of which the foregoing section is a part, "An act providing for interest on damages for personal injuries," is sufficient to cover actions for damages resulting from both fatal and nonfatal injuries. If the injuries result fatally the person bringing the action will of necessity be someone other than the deceased, which is the situation presented by the cases before us. We think it might well be said that a person, as the plaintiff here, who has lost the society, companionship and services of his wife and has expended money in an attempt to minimize or prevent such loss, has himself sustained a personal injury. We think it is not necessary however so to hold in order to bring the instant cases within the statute. In *Mulvey v. Boston,* 197 Mass. 178, 83 N. E. 402, the court, referring to a statute of limitations, said: "The language of the statute is not restricted to actions for injuries to the person of the plaintiff, and we think it is broad enough to include all actions of tort founded on injuries to the person of any one in such relations to the plaintiff that the injury causes him damage." Webster's International Dictionary gives as one definition of the word "for," and the one we think applicable to the construction of the statute before us, the following: "Indicating the cause, motive or occasion of an act, state or condition; hence, because of; on account of; in consequence of; as the effect of; for the sake of." We think the actions brought to recover damages for each of these torts were because of, on account of, and in consequence of personal injuries sustained by the plaintiff's wife of such extent that they finally resulted fatally. The cross assignments of error therefore must be sustained. The reasoning of the courts in opinions rendered in the following cases, though not involving statutes and situations identical with those under consideration in the cases at bar, is in point and supports the conclusion we have reached and expressed herein: *Mulvey v. Boston, supra; Braham v. Meridian Light & Ry. Co.*, 121 Miss. 269, 83 So. 467; *Bixby v. Sioux*

*City,* 184 Ia. 89, 164 N. W. 641; *Crapo v. Syracuse,* 183 N. Y. 395, 76 N. E. 465; *Titman v. Mayor, etc. of City of New York,* 10 N. Y. S. 689; *Price v. National Surety Co.,* 222 N. Y. S. 437; *Crapo v. Syracuse,* 90 N. Y. S. 553, 98 App. Div. 376; *International & G. N. Ry. Co. v. Edmundson* (Texas), 185 S. W. 402.

The judgments of the trial court will be amended so as to include interest, to be computed by the trial court, at the legal rate from the date of filing the complaints, and as so amended stand affirmed.

Judgments amended and affirmed.