MAGNOLIA PETROLEUM CO. et al. v. NORTON et al.

No. 30104. Sept. 9, 1941.

*116 P. 2d 893.*

Walace Hawkins, of Dallas, Tex., B. B. Blakeney, W. R. Wallace, and B. B. Blakeney, Jr., all of Oklahoma City, and H. M. Jarrett, of Chandler, for plaintiff in error Magnolia Petroleum Company.

Geo. W. Grant, of San Antonio, Tex., for plaintiff in error Transwestern Oil Company.

Edward H. Chandler, Paul B. Mason, and W. H. McBrayer, all of Tulsa, for plaintiff in error Sinclair Prairie Oil Company.

Donald Campbell, of Tulsa, for plaintiff in error Stanolind Oil & Gas Company.

P. D. Erwin, of Chandler, for defendants in error.

BAYLESS, J. Magnolia Petroleum Company et al. appeal from a judgment of the district court of Lincoln county in favor of Dot Norton et al. awarding Nortons the sum of $1,000 as damages to real estate resulting from the pollution of a stream running through the land.

The first contention relates to the lack of evidence of causation. Companies say: "The points to be proved to justify a recovery by the plaintiffs are: (1) that salt water escaped from the defendants' leases and reached the land of the plaintiffs; (2) that the plaintiffs' land was damaged; and (3) that the damage was caused by the salt water. Of these points, (1) was in effect admitted; (2) we may for the purpose of this question concede to have been established; but (3) is not proved, and it is with this that we are concerned. We may concede the proof to establish that salt, in sufficient concentration in water, will kill vegetation and will render soil incapable of supporting plant life—this is probably not proved, but the court will take judicial notice of that fact. Manifestly, however, the plaintiffs must go beyond this point to show that the salt water in question contained sufficient salt to injure soil and vegetation, and that it did injure them. We now turn to the evidence to discover what was proved." This greatly simplifies our consideration of this matter, and we say in passing that we think the state of the record justifies the admissions made by companies.

In addition to the testimony of lay witnesses respecting the noticeably briny taste of the water flowing through Nortons' land, Nortons also introduced the testimony of a pharmacist who analyzed water and soil samples to ascertain their salt content. This testimony placed the salt content of both the water and soil as far in excess of the injurious level. Testimony was also introduced of the lessened productivity of the soil, and of the death of numbers of pecan trees. Witnesses also testified to the observable fact that vegetation and trees died in areas affected by salt water overflow.

Companies introduced evidence to show that the salt content of the water and soil was well below the injurious level, that the particular farm had not suffered, and the testimony of an expert that the trees had died from borers.

We quote companies' brief again: "However, we have said that we did not propose to discuss any conflict in the testimony. . . . Here, just as there, 'not a single witness testified or expressed

an opinion that the water which overflowed' the plaintiffs' land 'contained sufficient salt to render it injurious to plant life of any kind'; no single witness so much as ventured an opinion that the plaintiffs' pecan trees or their soil was rendered unproductive because of salt contained in the water reaching the farm." That portion of the quotation saying that no witness testified that the water contained sufficient salt to render it injurious to plant life is incorrect. As pointed out before, Nortons' witness testified that the water did contain salt in quantities that are shown and known to be injurious. However, that part of the quotation that says that no witness ventured an opinion that the pecan trees were killed or the soil rendered unproductive because of salt water is substantially correct.

The fact that no witness for Nortons said directly that in his opinion the soil lost its fertility and the trees died as the result of the presence of the salt in the water and soil, when contrasted with the fact that an expert witness for companies testified that in his opinion the trees died from borers and there was not enough salt in the soil to reduce its fertility, gives rise to the contention made by companies. We understand them to say that this situation does not necessitate a resolve of the conflict of the evidence, but rather requires us to treat Nortons as being without evidence upon which to base a verdict.

Companies say, in effect, since it is known that trees die from many causes, including excessive salt in the water or soil environment and borers, it is not sufficient for recovery simply to establish a set of facts that go no further than permitting an inference that the nonproductivity of the soil and death of the trees could have resulted from this cause. Shell Petroleum Co. v. Worley, 185 Okla. 265, 91 P. 2d 679, and Prest-O-Lite Co. v. Howery, 169 Okla. 408, 37 P. 2d 303, and other similar holdings.

Companies carry their contentions on this point to the extent of saying (1) that the evidence of "expert" witnesses must be resorted to; or (2) if the opinion of an expert is given, the permissible inference from the facts and general opinions of "lay experts" disappears.

We think there are several reasons why this alternative contention cannot be sustained in whatever aspect it may be considered.

It seems clear to us that much of the companies' argument on this point presupposes a fatal gap in the facts from which the jury could draw the inference that salt caused the injuries and damage complained of. (1) All parties agree that salt in water and soil above certain proportions is injurious. (2) The evidence shows that the soil was productive and the trees alive as late as 1935, or 1936, or 1937. (3) That salt was present in the water and overflowed onto the land and was during those years and later present in noninjurious or injurious proportions. (4) Thereafter the soil was less productive and the trees dying and dead. (5) "Lay-expert" witnesses testified they had observed that when land was overflowed with salt water the soil lost its productivity and trees and vegetation died. As before stated, companies are in error when they say there was no proof of salt in the water and soil in injurious quantities, and therefore there was no gap in the fact chain.

Therefore, were Nortons obliged to have their "lay experts" give an opinion that salt did cause the soil to become less productive and the trees to die? We think not. This is an instance wherein "lay experts" could testify to their knowledge and observation, but once they had done so the jury was as apt at drawing an opinion as the witnesses. Wigmore on Evidence (3d Ed.) vol. 7, p. 10, secs. 1918 et seq. Given the admitted fact that excess salt produces such conditions, and barring the fact that a "lay expert" made an examination from which he was qualified to express an opinion, the jury was in as good position as the "lay expert" witness to draw a conclusion whether the

excess salt (if they believed it present) caused the injuries. We do not believe this is an instance where a so-called technical expert, scientific expert (Wigmore, supra, vol. 2, page 635, sec. 556) was required. It is well known, and the parties all assume, that the presence of salt in water and soil above tested levels is injurious to plant life. Each party had an analysis of the soil and water made, and the report of plaintiffs' analyst showed far more than enough salt to injure plant life. The lay experts did not qualify themselves to give more than their observation of the effect of salt on soil and plant life. Having proved the presence of salt in injurious proportions, plus the admitted fact of its injurious effect in such proportions, plus the description of the soil and plant life by competent observers, there was no necessity for the use of a technical expert. This is especially so where the defendants did not resort to the evidence of technical experts to ascribe the loss of the fertility of the soil to any other cause. This is not applicable to the trees. Defendants did introduce an expert witness, who ascribed the death of the trees to borers.

Allowing for the speculative character of the jury's verdict based on the death of the trees, which we will discuss further at a subsequent point, we think there was sufficient evidence on the issue of the cause of Nortons' injury to require submitting the issue to the jury.

Companies' next contention is that Nortons' evidence of damage is wholly insufficient. Nortons' showing in this respect consisted only of the testimony of one witness. No objection was made to his qualification to testify as to real estate value, but on cross-examination the basis for his opinion of the loss in value was greatly depreciated by witness' admissions of lack of knowledge and observation. However, we do not think companies succeeded in rendering his opinion inadmissible or subject to being stricken. At one place companies moved to strike witness' testimony as to value because of a lack of factual foundation and this was overruled, but any question of error was thereafter eliminated by testimony clearing up the point. Its basic worth was rendered doubtful. But this went no further than making it simply a matter for the jury. The loss of the trees was only one of several elements of damage to the land. No specific value was placed on the trees. It was the diminished value of the farm that was proved.

The verdict of the jury was moderate in view of all of the evidence, and so much so that we think it took into account the weakness of the opinion as to value. Also, if any error was present because of the speculative nature of the cause of the death of the trees, it was rendered virtually harmless by the size of the verdict.

Judgment affirmed.

WELCH, C. J., and RILEY, HURST, and ARNOLD, JJ., concur.