MAGNOLIA PETROLEUM CO. et al.
v. McGEELEY.

No. 33778.   Oct. 17, 1950.

*223 P. 2d 131.*

W. T. Anglin, Alfred Stevenson, O. S. Huser, and Stanley Huser, Jr., all of Holdenville, for plaintiffs in error.

James W. Rodgers, Hugh M. Sandlin, Marvin Balch, and James W. Rodgers, Jr., all of Holdenville, for defendant in error.

HALLEY, J.   Timmie McGeeley, a fullblood Creek Indian, was allotted and occupied as his homestead 160 acres of land in Hughes county, Oklahoma.   A small stream known as Caney (or Jacobs) creek runs along the west side of this land and, at three places, over onto the McGeeley land.   This creek empties into Wewoka creek, some 300 yards north of the north line of the 160-acre tract.   Adjoining Caney creek is about 30 acres of bottom land, most of which has been in cultivation since 1925, and on which are many pecan trees.   This bottom land overflows from the waters of both Wewoka and Caney creeks.   On the watersheds of these streams, the defendants operate a number of oil wells, and admit that both streams have been polluted from their wells for the past 15 or 20 years.

McGeeley alleges that the oil companies have permitted salt water and other deleterious substances to escape from their wells into these streams; that his bottom land has decreased in fertility; that his pecan crop has greatly decreased; that many pecan trees have died and many more are dying; that the value of Caney creek for stock water has been destroyed by its pollution.   He prayed for damages for permanent injuries in the sum of $2,000. The jury returned a verdict for $1,000, and the defendant oil companies have appealed.   We shall refer to the parties as "plaintiff" and "defendants", as they appeared in the trial court.

While the defendants admitted that the waters of Wewoka and Caney creeks had been polluted by salt water and other substances from their wells for many years, they denied that such pollution was strong enough to injure the soil, growing vegetation or pecan trees on plaintiff's land. They plead that they had previously paid McGeeley the sum of $350 for three ten-year easement rights along the bed of Caney creek and that should he recover herein, they should be given credit for the sum so paid, despite the fact that such written agreements were void because not executed according to law governing conveyances by restricted Indians. The defendants admitted that these agreements were entirely void, but claimed that they were executed in good faith, because an Inspector for the Indian Department had approved them in lieu of the Secretary of the Interior. This Inspector was then thought to have authority to approve such agreements, but it was later found that only the Secretary of the Interior had such authority.

The defendants first contend their demurrers to the plaintiff's evidence should have been sustained, along with their motions for a directed verdict. The rule applicable to these questions is well established. In Eagle Loan Co. v. Starks, 116 Okla. 151, 243 P. 725, it is said:

"Where there is any competent evidence offered by plaintiff reasonably tending to establish plaintiff's cause of action alleged in his petition and which should reasonably tend to support a verdict and judgment for the plaintiff, defendant's demurrer to the evidence and motion for directed verdict should be overruled."

In Pure Oil Co. v. Gear et al., 183 Okla. 489, 83 P. 2d 389, it is announced in substance that where there is any competent evidence reasonably tending to establish a cause of action, a demurrer to the evidence and motion for directed verdict should be overruled.

Under the foregoing rule, did the court err in overruling the demurrer of the defendants to the evidence of the plaintiffs. He testified that salt water had damaged his soil, his pecan trees, and his stock water. He stated that such injuries had resulted in decreasing the value of his farm from $5,500 to $3,500, and that he knew the value of farm lands in that community. He stated that 13 of his pecan trees had died and that many others were dying; that the fertility of his bottom land had been greatly decreased by salt water; and that Caney creek had been polluted. Most of his testimony was admitted over the objection of the defendants. Other farmers testified for the plaintiff to the same effect, over the objection of the defendants. None of these witnesses had had an analysis made of the soil or of the water to determine the salt content. They did not qualify as experts as to the effects of salt water on soil, vegetation or water. It is doubtful if they were qualified to testify as to the value of the farm before and after the pollution by salt water. However, N. N. Nussbaum testified for the plaintiff. He had been employed for many years by the U. S. Engineers, and part of his duties had been the inspection and valuation of land. For several years he had served as a land appraiser for the Indian Department at Holdenville. He inspected and appraised lands for leasing and sale and for damages caused by pollution. He testified that he knew the value of lands in the community where plaintiff's farm was located, and had inspected this farm several times and also appraised it. He testified that, from his experience, he believed that some of plaintiff's pecan trees had been killed by salt water, and that the salt content of Wewoka creek at flood stage was higher than at normal flow. He knew that some of the defendants on the

watershed of the streams mentioned had opened their slush pits when the streams were at flood stage and permitted the salt water to escape into the streams. He testified that plaintiff's farm was worth $5,000 prior to injuries by salt water and other deleterious substances, and that now it was only worth $3,250.

Under the rule of law above set out, we think it clear that the court was justified in overruling defendants' demurrer to plaintiff's evidence. There was certainly some competent evidence to sustain a verdict for the plaintiff. This court has often held that on appeal, it will not weigh the evidence, but that where there is conflicting evidence it will examine the record to determine whether or not there is some evidence to sustain the cause of action alleged by the plaintiff. While Mr. Nussbaum did not have the soil or the water analyzed, as an appraiser of land alleged to have suffered injury from salt water, we think that he had had sufficient experience to justify the court in admitting his testimony. It was held in Magnolia Petroleum Co. et al. v. Norton, 189 Okla. 252, 116 P. 2d 893, that the question of the qualification of an expert is largely in the discretion of the trial court. It was said in the second syllabus:

"The question of the qualification of an expert is largely in the discretion of the trial court, and the weight of his testimony is for the jury, and in the absence of an abuse of that discretion resulting in prejudicial error, this court will not reverse the case for a new trial on such ground."

We shall next consider the contention that after all of the evidence was in, the court should have sustained a motion for a directed verdict. In addition to the plaintiff's testimony above pointed out, we find that the defendants called two witnesses who testified that the value of plaintiff's farm was reduced from $300 to $400 because Caney creek was polluted, and two of their witnesses testified on direct examination that the value of the plaintiff's farm was reduced from $400 to $500 by reason of the pollution of Caney creek. In view of this testimony and the fact that the defendants admitted in their pleadings that Caney and Wewoka creeks had been polluted for some 15 or 20 years, we are forced to the conclusion that the motion for a directed verdict was properly overruled. The question may arise as to just what was meant by the defendants when they admitted that Caney creek had been polluted for many years. We think it is only fair to assume that they intended to use the word "polluted" in its ordinary sense. "To pollute" has been defined as "to make or render impure or unclean". If the water of Caney creek was admittedly polluted, we think this means that it was sufficiently affected by salt water or other substances as to make it unfit for stock water, its normal use. Four of the defendants' witnesses testified that the value of plaintiff's farm was decreased by reason of the fact that Caney creek was polluted. The defendants admitted that this creek was polluted and cannot now complain that their own witnesses cannot qualify as experts on the value of land or as to the effect of salt water on trees, vegetation or stock water streams.

The defendants contend that since they have heretofore paid the plaintiff $350 for easements permitting them to run salt water and other deleterious substances across his land, they should have a credit for such sum on any judgment rendered for the plaintiff. They requested an instruction to that effect, but it was refused, and the court instructed the jury that it should allow no such credit because the easements were void. The defendants admit that the easements were void. It had been held that they constituted a conveyance affecting restricted Indian land. These easements were approved by an Inspector appointed by the Superintend-

ent of the Five Civilized Tribes for the purpose of settling claims for damages to restricted Indian land. It is asserted, and not disputed, that at the time the easements were so approved, it was believed that the Inspector had authority to approve them, but it was later held that only the Secretary of the Interior had such authority.

Plaintiff claims that the easements were void as a violation of the statutes of Oklahoma. Sec. 273, Title 29, O.S. 1941, expressly forbids any person to "permit to be deposited" in any of the streams of this state any "crude oil or other deleterious substance" and makes such action a penal offense. Section 296, Title 52, O.S. 1941, provides, among other things, that "salt water shall not be allowed to flow over the surface of the land." In Tidal Oil Co. v. Pease, 153 Okla. 137, 5 P. 2d 389, this court construed section 296, supra, and in the body of the opinion said:

"The intent and purpose of the act is to prevent persons in the operation of oil and gas wells to deposit, oil, etc., in ponds, tanks, etc., or in streams used by others for watering stock, and also to prevent such operators from allowing salt water to escape from their wells and flow over the surface of the land of others. To hold that operators could not flow salt water over the surface of land owned by them or leased by them for that purpose, or to deposit same in pools or tanks on their own land, would in many cases render impossible development for oil and gas in fields where salt water is produced. It would result in depriving the owner of land of the right to use it to his own advantage, where such use would in no way harm or injure others."

In the later case of Stanolind Oil & Gas Co. v. Phillips, 195 Okla. 377, 157 P. 2d 751, the Pease decision, supra, was cited with approval, and the above portion of that opinion quoted, and it was further said:

"In the instance of land leased to Phillips, the owner had contracted for all damages done or to be done to him, a thing he had a legal right to do; and had agreed not to sue for any future damage, a thing he had a right to do; and had agreed to let defendants and others flow these substances onto his land, a thing he had a right to do under the above decision. If he had the right to contract such things with and to the defendants, his lessee thereafter with constructive notice of such easement does not acquire a right from him to restrict what he had already contracted away. His tenant stands in no better position."

This court, in Yell v. McCarty, 90 Okla. 151, 216 P. 158, announced the following rule:

"While a court of equity will not require, as a condition precedent to cancellation of a deed executed in violation of the restrictions imposed by Congress on Indian lands, the return of the purchase money, where such condition would in any way impair the right of the Indian to recovery of the land, or in any way interfere with his possession of the same free from encumbrance, yet a court of equity may permit the purchase price paid as consideration for such void conveyance to be offset against the amount due as rent for the occupancy of the lands."

From the foregoing decision it appears that even though the easements claimed were void as contrary to the Federal statutes, the consideration paid therefor in good faith may be considered by a court of equitable powers as an offset against any judgment given the plaintiff for damages arising from the same or similar causes as those for which the defendants undertook to satisfy the plaintiff by purchasing the privilege of permitting pollutive substances to cross his land. It is suggested that perhaps the jury did take into consideration the $350 previously paid plaintiff, since the plaintiff sued for $2,000 and the jury's verdict was for only $1,000. We think we must assume that the jury followed the very definite instructions of the court that it could not consider the $350 previously paid.

The defendants cite the case of Shell Petroleum Corp. et al, v. Worley, 185 Okla. 265, 91 P. 2d 679, wherein the plaintiff offered no evidence as to the alleged damage to his land by salt water, other than the testimony of a witness who was clearly not an expert and had not had sufficient experience with the effects of salt water to entitle him to give an opinion as to the cause of the damage claimed. The defendants in that case introduced the testimony of experts showing positively that the salt content of the water was not sufficient to injure the soil or render the water unfit for use as stock water.

In the case before us we have noted carefully the testimony of Dr. Isham, who was an expert chemist. He testified positively that the salt content of Wewoka creek at flood stage was not sufficient to injure plant life. He made 33 tests of the soil taken from various parts of plaintiff's bottom land, and found that none of them showed sufficient salt content to injure plant life or trees. For some reason he did not analyze the water of Caney creek. No other witness ever tested this water. One of defendants' witnesses was asked why he did not have it analyzed, and he answered that he supposed it was bad and considered it unnecessary to analyze it. One witness said the water of the creek had been unfit for stock water for many years. The fact that the defendants had undertaken to secure from the plaintiff the right to run salt water and other substances over his land might properly be considered by the jury as an admission that the stream was polluted by substances from their wells to such an extent that it was unfit for its ordinary and common use. The witness Nussbaum testified that several applications of salt water might injure land and vegetation thereon, where a single application might not be injurious to the land. The witness Van Hoozer testified that he knew land values in the community and that he considered plain-

tiff's farm worth $35 per acre prior to the application of salt water, and that he now considered it worth from $15 to $20 per acre. The witness Nussbaum, whose duties as an employee of the Indian Department consisted partly of appraising land values where affected by pollution from oil wells, estimated that the value of plaintiff's farm had been reduced by pollution from $5,000 to $3,250. We conclude that there was competent evidence to support the verdict of the jury, which was for one-half the amount sued for.

The trial court is hereby directed to reduce the amount of the judgment in the sum of $350; and, as so modified, the judgment is hereby affirmed.

DAVISON, C.J., ARNOLD, V.C.J., and WELCH, CORN, LUTTRELL, JOHNSON, and O'NEAL, JJ., concur.