**MILLER CONSTRUCTION COMPANY, Inc., a corporation, Plaintiff in Error,**

v.

**Beetha L. WENTHOLD, Administratrix of the Estate of Leonard S. Wenthold, Deceased, Defendant in Error.**

**Beetha L. WENTHOLD, Administratrix of the Estate of Leonard S. Wenthold, Deceased, Plaintiff in Error,**

v.

**AJAX CONTRACTORS, INC., a corporation, Defendant in Error.**

Nos. 41361, 41378.

Supreme Court of Oklahoma.

Sept. 9, 1969.

Rainey, Flynn, Welch, Wallace & Cooper, Oklahoma City, for plaintiff in error, Miller Construction Co.

Floyd L. Martin, Rhodes, Crowe, Hieronymus, Holloway & Wilson, Oklahoma City, for defendant in error, Beetha L. Wenthold, Administratrix of the Estate of Leonard S. Wenthold.

Looney, Watts, Looney, Nichols & Johnson, Oklahoma City, for defendant in error, Ajax Contractors, Inc.

WILLIAMS, Justice:

This litigation involves appeals from judgments entered in the District Court of Oklahoma County in an action brought for the alleged wrongful death of one Leonard S. Wenthold which was caused by his being pinned between the rear portion of a hoisting crane and a truck when sewer pipe was being loaded at Tinker Field near Oklahoma City.

For purposes of clarity the parties will be referred to herein as follows: Beetha L. Wenthold, administratrix of the estate of Leonard S. Wenthold, deceased, as "plaintiff"; defendant Midwestern Engine and Equipment Company as "Midwestern"; defendant Ajax Contractors, Inc., as "Ajax"; defendant Miller Construction Company as "Miller" and defendant James C. Foster d/b/a Shields Construction Company as "Foster". These are the respective relationships the parties bore to each other in the trial court. The deceased Leonard S. Wenthold will be referred to as "Wenthold".

Plaintiff in her action filed in the district court joined Midwestern, Ajax, Miller and Foster as defendants. She contends that Ajax and Miller entered into a joint venture to move certain pipe from Tinker Field and secured the services of Wenthold with his trucks to do the hauling. Midwestern owned the crane used in loading the pipe. Foster operated the crane. At the close of plaintiff's evidence she confessed Midwestern's demurrer to the evidence. Foster was never served with summons. The case was submitted to the jury as to the defendants Ajax and Miller. The jury returned a verdict in favor of the plaintiff against Miller for $47,500.00 but declined to return a verdict against Ajax.

In cause No. 41,361 Miller prosecutes an appeal to this Court from the judgment on the verdict entered against it in favor of the plaintiff. In cause No. 41,378 plaintiff prosecutes an appeal to this Court from the judgment entered by the trial court in favor of Ajax and against the plaintiff.

This Court has by previous order properly consolidated the two appeals for briefing and disposition.

Prior to the happening of the accident with which we are here concerned, Miller entered into a written contract with the United States of America to replace certain storm drainage sewers located at Tinker Air Force Base. Among others, the contract contained provisions that the contractor (Miller) would give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Government's Contracting Officer, on the job at all times, with authority to act for the contractor; that the contractor would conform to certain prescribed safety rules and requirements and take all reasonable steps and precautions to prevent accidents and preserve the life and health of all personnel concerned or in any way coming in contact with the performance of the contract on the premises; that all materials from excavation that were unsuitable or not required for backfill or grading would be removed from the site by the contractor, that all grounds would be restored to their original condition and all effects of construction removed; and that all debris and broken concrete would be properly "disposed of."

One provision of the contract was of effect that when crane operators were working their equipment in areas where vision was limited, they would use signalmen to direct operations; that these signalmen, using standard hand signals, would be in positions where they were visible to the operators and at the same time could see the equipment booms, tracks, and loads; that operators would move their machines only on signs from the signalmen, and that they would not take signals from any one else except in extreme emergencies.

Miller's superintendent in sole charge of the project was Ed G. Shetley. In

carrying out the replacement project it was necessary for Miller to uncover the old pipe, remove it and install new pipe. As the old pipe was removed it was placed on the surface of the ground near the air strips or runways of Tinker Field.

The proper officials at Tinker Field considered the loose pipe to be debris or broken concrete as defined in the contract and directed Miller to remove it from the Tinker Field area.

On an occasion described in the evidence, Frank J. Winter, president of Ajax, and James W. Miller, an employee of Miller, Incorporated, were eating dinner together. Winter told James Miller that he thought he could sell the discarded pipe. This was followed by several telephone and verbal conversations between Frank Winter and James Miller representing their respective companies. The authority of Frank Winter and James W. Miller to represent their respective companies is not disputed. These conversations culminated in Frank Winter for Ajax and James W. Miller for Miller entering into a verbal agreement whereby Winter agreed to, if possible, secure a buyer for the pipe and load and move it off the premises to a place designated by the buyers. It was agreed that Winter was to secure trucks for the hauling of pipe and was to deduct the hauling expense from the money received from the sale of the pipe. It was agreed that the balance of money was to be divided equally between Ajax and Miller. Both Winter and James Miller testified that no loss in the transaction was anticipated and the question of payment of losses, if any, was not discussed.

At the time he commenced work on the project Miller leased a crane described as an "Osgood back-hoe" from Ajax and used it in connection with the replacement project.

A few days before the accident in question occurred, Miller called Winter and told him that the officials at Tinker Field were insisting that the pipe be removed from Tinker Air Base immediately. Winter told Miller that he had secured a buyer for the pipe. Tentative arrangements were made to move the pipe commencing on a certain Sunday. Miller informed Winter that the Osgood back-hoe crane Miller had leased from Ajax was out of order and would not be available for use in loading the pipe. He asked Winter to secure another crane for this purpose and deduct the expense from the money received from the sale of the pipe.

Winter called Smith, a truck operator in Oklahoma in an attempt to secure trucks for hauling the pipe. Smith had no trucks available but advised Winter that he would try to secure trucks for him. He later called Winter and told him he had arranged with another truck operator to have two trucks at Tinker Field at 8:00 A.M. on the specified Sunday, and that the truck operator would handle the pipe for $20.00 per load. The truck operator secured by Smith was Leonard S. Wenthold.

In the meantime Foster through some source learned of Winter's need for a hoisting crane. He called Winter and agreed to furnish a hoisting crane for use in loading the pipe at Tinker Field for an agreed compensation of $10.00 per hour for the crane and operator.

On the Sunday morning in question, Winter drove to Tinker Field taking with him a mechanic to check the repairs being made to the disabled "Osgood back-hoe." At Tinker Field he met Leonard S. Wenthold for the first time and confirmed the agreement to the effect that Wenthold was to haul the pipe for $20.00 per load. Wenthold had brought to the job, one truck driven by himself, a second truck driven by one of his employees and a swamper or helper, one Odell Teder. Mr. Foster brought to the job a mobile crane which he had secured from Midwestern.

Ed G. Shetley, superintendent for Miller, was present on the job and gave directions concerning the loading operations. He pointed out the sections of pipe to be loaded first. He then left the premises. His brother, Bill Shetley, and other Miller employees fastened the hooks to sections of

pipes so they could be picked up by the crane and loaded. A Miller employee using a bulldozer (Bill Shetley) pushed or rolled the sections of pipe to a position where they could be loaded. Each section of pipe was lifted by the crane and placed crosswise on the bed of the truck. It was then chocked by placing pieces of wood under the pipe to keep it from rolling. Four sections of pipe were placed on each truck as a truckload. The load was boomed down to the body of the truck by using chains and boomers.

The truck driven by Wenthold was the first loaded and the pipe transported to the corner of Northwest May and Sixtieth Streets in Oklahoma City. Winter rode with Wenthold in delivering the first load. At one time he asked Wenthold to drive a little slower and told him he would pay him an additional $4.00 per load if he would drive slower. Winter testified that with fast driving he was afraid the pipe might become loose causing damage to it.

The accident occurred soon after lunch while the truck driven by Wenthold was being loaded a second time.

Odell Teder, the swamper on the trucks, was an eye-witness to the accident. He testified that during the loading operations Foster, the crane operator, was having trouble with the crane; that it was necessary for Foster to keep the boom up high in an almost vertical position all the time the pipe was being loaded; that when the boom was out in a less vertical position and an attempt was made to pick up the pipe the boom would fall; that if the angle of the boom had been lower the distance between the truck and the crane would have been greater; that upon his return from lunch the crane was standing with the boom up in an almost vertical position and a section of pipe attached to the hoisting line suspended in mid-air; that the crane operator, Foster, asked Wenthold to back his truck up under the boom and had him move out and back still closer, which he did, causing the truck to be very close to the crane; that Foster lowered

the section of pipe on to the truck; that Teder and Wenthold commenced chocking the pipe in place; that Wenthold was standing between the truck and the crane with his back to the crane; that Foster swung the boom of the crane around to pick up another section of pipe and in doing so the back of the crane struck Wenthold and pinned him between the back of the crane and the truck; that Teder shouted a warning to Wenthold but it was too late; and that Wenthold's body was crushed and he was taken away by an ambulance. Mr. Wenthold died almost immediately.

Shortly after the accident Ajax completed the hauling of the pipe, using other trucks and collected the purchase price from the purchasers. Ajax made an adjustment with Miller in accordance with their 50-50 agreement.

Odell Teder testified that at the time of the accident the crane was being operated solely by Foster and that there was no signalman present to assist him. Winter and James Miller conceded that there was no signalman assisting Foster with the operation of the crane unless the swamper Teder could be considered a signalman.

Miller and Ajax contend that the District Court of Oklahoma County had no jurisdiction to hear and determine the controversy and that exclusive jurisdiction thereof was vested in the State Industrial Court.

As stated hereinabove, plaintiff filed the action from which this appeal arose in the district court. Thereafter she filed a form 3 in the office of the State Industrial Court naming as respondents Ajax and Miller, alleging that she was entitled to death benefits under the provisions of the Oklahoma Workmen's Compensation Act for the death of her husband Leonard S. Wenthold while employed by the respondents Ajax and Miller. She added to the form 3 a condition stating that she was advised that Wenthold was working as an independent contractor at the time of the accident and that she had filed a Cause No. 153,824 in the District Court of Oklahoma

County against Ajax and Miller for the wrongful death of her husband. She requested the Industrial Court to hold her compensation claim in abeyance pending a final determination of the issues presented in cause No. 153,824.

Miller and Ajax filed motions to dismiss contending that the District Court of Oklahoma County was without jurisdiction. The trial judge overruled the motions and entered an order staying all proceedings in connection with the compensation claim pending final determination of plaintiff's suit in the district court. Miller and Ajax renewed their jurisdictional pleas in their answers.

■ In Rex Truck Lines, Inc. v. Simms, Okl., 401 P.2d 520, we held that where there was a conflict of jurisdiction between the State district court and the State Industrial Court the two courts have concurrent jurisdiction to hear and determine the jurisdictional question and the court first acquiring jurisdiction should be permitted to hear, determine and adjudicate the question.

The order of the trial court in retaining jurisdiction over the controversy and issuing an order staying proceedings before the State Industrial Court is correct. Rex Truck Lines, Inc. v. Simms, supra; Haggard v. Calhoun, Okl., 294 P.2d 836.

■■ The undisputed evidence is to the effect that Wenthold verbally contracted to provide trucks and haul pipe at an agreed price per load. In our view, the jury was warranted in finding that the relationship was clearly that of independent contractor as distinguished from that of master and servant. The State Industrial Court possessed no jurisdiction over the controversy. Johnson v. Haskell Lemon Const. Co., Okl., 262 P.2d 142; Williams v. Branum, 192 Okl. 129, 134 P.2d 352; Porter Const. Co. v. Burton, 156 Okl. 72, 8 P.2d 64.

Miller contends that the verdict and judgment against it is not sustained by evidence and is contrary to law.

Plaintiff prosecutes her action on the theory that Ajax and Miller were joint venturers in the loading of the pipe and also on the theory that they were joint tort-feasors in such loading.

From our examination of the record, we are of the view that the jury was warranted by the evidence in finding that the relationship between said defendants was other than that of joint adventurers.

■ In actions for tort against several defendants alleged to be joint tort-feasors, judgment may be rendered against one or as many of defendants as the proof shows were guilty of the negligence, and in favor of those as against whom the proof fails. City of Sapulpa v. Young, 147 Okl. 179, 296 P. 418, 430, 431, citing with approval 49 C.J.S. Judgments § 35, p. 83.

■ We determine that the jury was warranted in making the finding necessarily included in its general verdict that Miller was a tort-feasor. Miller made a contract with the government to move the pipe from Tinker Field. By terms of the contract he agreed to "take all reasonable steps and precautions to prevent accidents and preserve the life and health," of anyone, "coming in contact with the performance of this contract on such premises." The jury would have been warranted in finding that in loading the pipe, Miller's crane operator was negligent or that Miller in the operation of the crane in question without a "signalman to direct operations" was negligent. The evidence clearly warrants a finding that the accident was caused by these acts of negligence on the part of Miller.

■ The evidence against Ajax is not so well defined. It is true that Ajax made the arrangements with Foster to furnish and operate the crane. Ajax and its representative Winter did not actively participate in the loading and hauling of the pipe. Winter had left the premises before the accident in question occurred. The jury was warranted in returning a verdict

against the defendant Miller, the one primarily charged with safely loading and moving the pipe, and at the same time exonerating Ajax whose acts consisted of merely providing the equipment to be used in loading and moving the pipe. The two conflicting judgments are not necessarily inconsistent.

The verdict and judgment in favor of the plaintiff and against the defendant Miller and the judgment of the defendant Ajax against the plaintiff are both sustained by reasonable, competent evidence and will not be disturbed by this Court on appeal. Roger Givens, Inc. v. Mustex, Inc., Okl., 410 P.2d 42; Wickham v. Belveal, Okl., 386 P.2d 315; Yellow Cab Co. v. Allen, Okl., 377 P.2d 220; Cherry v. Watson, 88 Okl. 54, 211 P. 79.

Miller contends that the trial court erred in permitting counsel for the plaintiff to read to the jury portions of the pre-trial depositions of Frank Winter, President of Ajax, and James Miller, representing Miller. Both Winter and Miller were present in court at the time the depositions were read. Plaintiff was permitted to read the depositions to the jury as admissions against interest as is permitted under the provisions of 12 O.S.1961, § 447, as amended by Chapter 10, Session Laws 1961, p. 63.

We have examined the portions of the depositions read to the jury by counsel for the plaintiff. The statements read to the jury contained to a large extent admissions against interest. The statements made by Winter were principally against Ajax. In view of the fact that the jury exonerated Ajax, any statement made by Winter against Ajax would be harmless from the point of view of Ajax. The statements made by Miller were in many instances against the defendant Miller. Miller later in the trial testified as a witness for the corporate defendant Miller. There is little conflict between the statements made in his deposition and his testimony as a witness for the defendant Miller at the trial.

In Henry Building Company v. Cowman, Okl., 363 P.2d 208, we held:

"Where portions of a defendant's deposition are read to the jury and defendants object because the defendant was in the court room and available as a witness, this court will not reverse where such evidence is purely cumulative and corresponds with testimony properly given by the defendant after he was called as a witness unless we are able to perceive prejudicial effect therefrom."

█ In our view, if admission of the Miller deposition into evidence were considered to be error, it would be harmless.

The trial court admitted the depositions on the theory of joint adventure and that the admissions against interest of one joint adventurer were admissible against the other joint adventurer. As has been shown hereinabove, this theory of defendants' alleged joint liability had been pleaded. The statements were therefore admissible.

The trial judge carefully advised the jury regarding the use of the statements as admissions against interest. It is not established that the rights of the defendant Miller were prejudiced by the reading of the depositions.

The ruling of the trial court permitting the reading of the depositions did not constitute prejudicial error or an abuse of discretion. Brown v. Marker, Okl., 410 P.2d 61.

█ Miller contends that the trial court erred in instructing the jury on the doctrine of independent contractor. Miller contended that the relationship between it and Ajax was that of independent contractor. We have examined the instruction submitted by the court to the jury on this proposition. The instruction properly submits to the jury the question as to whether Wenthold was an independent contractor as outlined in Morain v. Lollis, Okl., 371 P.2d 473 and Mistletoe Express Service, Inc. v. Culp, Okl., 353 P.2d 9.

■ The judgments in favor of the plaintiff and against the defendant Miller Construction Company and in favor of the defendant Ajax Contractors against the plaintiff are supported by reasonable competent evidence and are in accord with the law˙ as declared in prior decisions of this Court.

Affirmed.

All the Justices concur.