Tommy J. CARTWRIGHT, James F. Murphy, and Stephen A. Little, Co-Administrators of the Estate of Ira L. Lauderdale, Deceased, Appellees,

v.

ATLAS CHEMICAL INDUSTRIES, INC., a Foreign Corporation, Appellant.

No. 50527.

Court of Appeals of Oklahoma, Division No. 1.

April 18, 1978.

Rehearing Denied May 23, 1978.

Certiorari Denied March 19, 1979.

Released for Publication by Order of Court of Appeals March 22, 1979.

Jack B. Sellers Law Associates, Inc. by Jack B. Sellers, Sapulpa, for appellees.

Dan A. Rogers, W. Michael Hill, Tulsa, for appellant.

BOX, Presiding Judge:

An appeal by Atlas Chemical Industries, Inc. (Atlas), defendant in the trial court, from a manufacturers' product liability case. Plaintiffs-appellees are the co-administrators of the estate of Ira L. Lauderdale, deceased, who brought a survival cause of action for the benefit of the estate seeking damages for pain and suffering and reimbursement for medical expenditures and a wrongful death action for the pecuniary loss suffered by the beneficiaries by reason of the death of decedent. The beneficiaries consist of the widow and two adult daughters.

Decedent was a sixty-one year old welder who was employed by Cimarron Pipeline Company (Cimarron). On September 8, 1971, decedent was in the process of moving dynamite fuse caps when he allegedly dropped a partially filled container causing one or more of the caps to explode which, in turn, caused detonation of the remaining caps. Decedent died as a result of injuries sustained in the explosion. The caps involved in the explosion were allegedly manufactured by Atlas. Plaintiffs brought both the wrongful death and survivorship causes of action based upon manufacturers' product liability. Plaintiffs' main contention was that Atlas caps were high explosives capable of detonation when subjected to impact force. Given this susceptibility, the packaging of the caps was defective inasmuch as the caps were not cushioned from one another and would strike against each other if dropped which made the product unreasonably dangerous to the consumer.

Plaintiffs initially sued American Cyanamid Company (American Cyanamid) and Deupree Distributing Co., Inc. (Deupree) as co-defendants. However, plaintiffs dismissed their causes of action against these defendants without prejudice.

Upon submission of the case to the jury, a verdict was returned in favor of plaintiffs in the total amount of $272,045.28. On appeal, Atlas asserts nine propositions of error which will be discussed under separate headings. This court commends the parties for the excellent briefs provided.

## I. Sufficiency of the Evidence

Atlas' first contention is that plaintiffs failed to establish a prima facie case inasmuch as the evidence failed to establish a defect existed or that the defect caused the accident and the trial court erred in refusing to direct a verdict in favor of Atlas.

In order to establish a prima facie case in manufacturers' products liability under *Kirkland v. General Motors Corp.*, Okl., 521 P.2d 1353, plaintiffs must prove: (1) that the product was the cause of the injury; (2) that the defect existed in the prod-

uct at the time it left the possession and control of the manufacturer; and (3) that the defect made the product unreasonably dangerous to the user or his property. Unreasonably dangerous is defined at pages 1362–63 of *Kirkland,* as follows:

"The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

Plaintiffs contend that the defect existed in the packaging of the dynamite caps.

The parties entered into numerous stipulations, all of which are not necessary to enumerate at this time. Stipulations 8 and 9 read as follows:

8. That it was intended by Atlas in the manufacture and packaging and sale and distribution of the caps it made during the time material to this case that the caps would reach the ultimate user or consumer in the same and unchanged condition was made and packaged by them.

9. That it is agreed in this case such Atlas caps as were sold to Cimarron Pipeline by Deupree, or if any, from American Cyanamid, were delivered to Cimarron in the same condition as when manufactured, packaged and sold by Atlas.

These two stipulations were sufficient to establish element number two of plaintiffs' prima facie case. Thus, plaintiffs had only to prove a defect existed in the product which caused the injury and the defect made the product unreasonably dangerous to the user.

The parties further stipulated that it was foreseeable to Atlas that dynamite caps might be dropped by the user from heights of four feet and that Atlas had the control and discretion of choice of packaging materials, subject to governmental regulations, if any.

In order to rule on Atlas' first contention, it becomes necessary to summarize the evidence presented by the parties. The transcript of evidence encompasses 687 pages.

For this reason, the summary is not meant to include a detailed account of each witness' testimony. The objections to various portions of plaintiffs' evidence will be discussed under separate headings.

Plaintiffs' first witness was Lawson Dan Glenn, a welder for Cimarron, who was working with decedent on the date of the explosion, September 8, 1971, between 7:30 and 8:00 A.M. Mr. Glenn and decedent went to the shed to put protective covers over the locks of the storage magazine. They took no welding equipment in the shed and nothing was present which could have produced a spark. In order to put the protective covers over the locks of the magazine, it was necessary to move the dynamite caps that were located therein. There were two full cartons of caps plus one partially filled carton with loose caps without a lid (referred to as a tray). Mr. Glenn removed the first full box and handed it to decedent. Decedent carried the box and set it on the floor, 15 or 20 feet from the magazine. Mr. Glenn reached to remove the second full box while decedent was in the process of setting the first upon the floor. The same procedure was followed for the second full box of caps. The third box was a partial carton with several boxes removed so the remainder were loose. Mr. Glenn handed decedent the partially opened carton who proceeded to carry the box to set it on the floor. Mr. Glenn squatted down in front of the magazine to measure the lock and then decedent said "Dan" in a normal voice. Mr. Glenn raised and turned toward decedent but all he saw was the blast.

Clovis Dale Hester, president of Cimarron, testified he bought all his caps from Deupree and all the caps were stored in the magazine.

Willis Dyer, Jr. was the office manager for Cimarron for eighteen years and had custody and control over the magazine box. Mr. Dyer testified that the magazine contained two cartons and one tray. The last 6,000 caps purchased by Cimarron came from Deupree and Cimarron never purchased elsewhere. No other brand besides Atlas caps was in the magazine. The morning of the accident, Mr. Dyer had put the tray back in the magazine. The tray was partially filled with Atlas caps, some caps had been removed and a rag had been placed around it.

Willis Cummisky was the magazine keeper and manager for Deupree, an explosive distributor. After June, 1965, Deupree only received Atlas fuse caps and the oldest were sold first.

Joseph E. Deupree testified during plaintiffs' rebuttal. Mr. Deupree was associated with Deupree and supervised the record keeping. Since 1965, Deupree delivered only Atlas Number 6 caps and had never sold Dupont fuse caps.

Dr. John D. Hesson treated decedent in the emergency room. Dr. Hesson asked decedent what happened and "he was moving some dynamite caps and he thought he may have dropped them, and he said they exploded."

Plaintiffs called as their first expert witness Robert J. Grubb, chief chemist of the Warner Plant of American Cyanamid Company who was familiar with the general types of explosives manufactured in the United States. Two chemicals contained within the Atlas caps are HNM (Hexanitromannite) and Diazo (Diazodinitrophenyl) and both were considered by Mr. Grubb as high explosives. He stated that impact or shock energy of sufficient quantity can detonate these explosives. There is a level of impact above which all caps will detonate and below which none will. There is also a level of impact where some caps will detonate and others will not. On cross-examination, it was determined Mr. Grubb was not qualified to testify on the exact amount of force necessary to detonate a cap inasmuch as he had never performed drop tests on Atlas caps. If one cap in an Atlas tray, containing 100 caps, exploded there is a very high probability they all would detonate. In the explosion, the metal contained in the shell would be torn into shrapnel and thrown at high velocity. The presence of grit or impurities in the cap increases its sensitivity. Mr. Grubb's opinion was that

caps that were afforded no cushion from one another with grit present in the caps and dropped four feet would be unreasonably dangerous to the consumer.

Robert E. Fearon, a chemical engineer educated in the fields of physics, chemistry and mathematics who has detonated and dissected caps to examine and analyze them, was called as plaintiffs' second expert witness. Atlas caps contain PETN (Pentaerythitol Tetranitrate), a very powerful and quite sensitive explosive. Mr. Fearon considers PETN more sensitive than nitroglycerin as to impact. Impurities which make PETN more sensitive are grit and void spaces filled with air. If PETN was dropped four feet onto the floor with a bubble of air contained therein and there was no cushioning, Mr. Fearon felt one of the caps might get hurt and explode. It was his opinion that there is a probability of any high explosive exploding if it suffers an impact. Mr. Fearon testified HNM was a high explosive, quite sensitive to shock and very dangerous to put any impact on.

According to Mr. Fearon, time, temperature and relative humidity are the things that do harm to explosives, such as being placed for a long time in a warm place with high humidity. In Oklahoma, there would be some damage after a long period of storage. Assuming the Atlas caps had been stored in the shed at Cimarron for fifteen months up to two years, Mr. Fearon's opinion was that when the caps were dropped, one exceeded its toleration limit. The fact that the caps were not cushioned from one another made Mr. Fearon feel they were unreasonably dangerous to the consumer. Mr. Fearon also expressed the following opinion:

It is my opinion that the provision of metallic contact, that is, the contact of these metal cases with one another is an unnecessary invitation to a hard jolt because metal is striking on metal if anything happens, and it's also—that relates to the manner of packaging. And it's also my opinion that there could have been within the statistics of the manufacturer some variation that would result and probably did result in some of the caps being much more sensitive than the other ones were.

Mr. Fearon has never been employed by a manufacturer of explosives and had disassembled an electric cap containing lead azide which is more dangerous than an Atlas fuse cap which does not contain lead azide.

Robert E. Hebert, a packaging engineer, was called as an expert for plaintiffs. In response to a hypothetical question, Mr. Hebert testified that a proper package for caps sensitive to impact would be to restrict the movement in the container of the individual blasting caps and then to cushion them from impact from one another. Barrier bags could prevent exposure to moisture and air. Materials such as molded styrofoam or slotted chipboard for partitions could be used as cushioning at a very minimal cost to the manufacturer. Mr. Hebert felt it was quite feasible from an engineering and economic standpoint to package caps to absorb the shock of a four foot drop in both the primary and intermediate container. Mr. Hebert stated the package used by Atlas provided no protection on the interior; the caps are not protected on impact from one another. If one cap is removed, the remaining caps roll about knocking against each other. The exterior box is thin chipboard which will transmit impact to the caps inside providing very little cushioning. Because the caps could move about, they would hit on the more susceptible part to explosion if dropped (the heavier end). Military specifications call for paperboard partitioning the caps with the box placed in a barrier bag.

Ralph Lash has been a packaging engineer for thirty years. He testified to the use of rolls of polyethylene (plastic) to cushion caps from one another at a cost of two-tenths of a cent to separate a hundred fuse caps. (The packaging would be similar to that of Contact Cold Capsules.) Mr. Lash also prepared a package made of corrugated chipboard so the caps could not strike each other if dropped. Mr. Lash's opinion was the package used by Atlas had no cushioning value whatsoever.

Atlas called as its first defense witness Anna K. Orlosky, who works on the cap line at Atlas. Ms. Orlosky's job is to rumble the caps. The caps are placed in the rumbler bag which cleans the excess powder off the shells with damp sawdust. Ms. Orlosky does position herself behind bullet proof glass and wears special clothing to rumble. There is only a visual inspection without any optical aids to determine if there are any bad caps or if the caps are clean, no powder or foreign bodies remaining on the caps.

Arthur Boman, a research chemist for Atlas, testified that several months exposure to high humidity and temperature desensitizes the caps; they become less likely to explode. Mr. Boman had performed drop tests from thirty feet on Atlas caps and had also placed the caps on a steel anvil and dropped a ten pound weight upon them. No explosion resulted in either case.

Paul Miller is the Director of Governmental Affairs for Atlas. He testified the reason for the military specifications was because the caps were dropped by parachute and there was need for more protection during clandestine work behind enemy lines. Mr. Miller stated the use of plastic in packaging as testified to by Mr. Lash was incorrect. The plastic generates or stores static electricity which represents a hazard to explosives. Mr. Miller did not believe it was possible to drop Atlas caps four feet and have them detonate. On cross-examination, Mr. Miller stated that before the caps leave the plant they are cushioned from shock through the use of two inches of sawdust between the intermediate carton and outside shipping carton.

George Keenum, the area manager for Atlas, searched the scene of the accident the day after the explosion and found several unexploded caps. Atlas caps have a round bottom. Some of the caps found had indentations on the bottom and were one-eighth inch shorter than Atlas caps. They were shown to be Dupont, not Atlas, caps upon X-Ray. However, in his deposition, Mr. Keenum stated the caps he found were the general color, size and appearance sold by Atlas. It was stipulated Mr. Burnett would have testified he investigated the accident and he found unexploded caps and gave them to Mr. Keenum, but he did not and was not asked to mark them.

Melvin A. Cook, a consultant in the field of explosives, was called as an expert witness for Atlas. It was his opinion caps are not affected by the temperature in Oklahoma. High humidity and moisture make the caps less sensitive. Caps are most sensitive when brand new and do not become more sensitive in normal use. Mr. Cook expressed the opinion that caps dropped four feet in a partially filled box would not detonate.

■ Although the evidence presented by the parties was conflicting, this court believes the evidence offered by plaintiffs was sufficient to establish a prima facie case in manufacturer's product liability. In passing upon this contention, the evidence must be viewed in the light most favorable to the plaintiffs and all evidence tending to derogate plaintiffs' position must be disregarded. *Jackson v. Cushing Coca-Cola Bottling Co.*, Okl., 445 P.2d 797; *Wilson v. Chicago, Rock Island & Pacific R.R. Co.*, Okl., 429 P.2d 763. Taken in the light most favorable to plaintiffs, the evidence tended to show that caps manufactured by Atlas, not Dupont, caused the explosion and that Atlas caps were a combination of high explosives that could be detonated by impact force. Atlas voluntarily packaged the caps in such a way that the caps in the intermediate package would strike against one another after one cap had been removed if dropped from four feet. Plaintiffs' experts testified the packaging was defective in that it did not protect the caps from external trauma when proper packaging was readily available and feasible from an engineering and cost standpoint. While moving a partially filled carton, decedent dropped the caps, which the parties stipulated was foreseeable. When dropped, the caps exploded. Proper inferences could be drawn that the product as packaged made it unreasonably dangerous to the consumer and the product was the cause of the injury.

Circumstantial evidence may be relied upon by plaintiffs in a manufacturers' product liability case. The Supreme Court in *Kirkland,* supra at 1355, held:

### Syllabus by the Court.

5. The plaintiff may prove his cause of action in Manufacturers' Products Liability by circumstantial evidence and proper inferences drawn therefrom, since actual or absolute proof of the defect in a sophisticated product may be within the peculiar knowledge or possession of the defendant.

See also *Sadler v. T. J. Hughes Lumber Co., Inc.,* Okl.App., 537 P.2d 454; see generally *Highway Const. Co. v. Shue,* 173 Okl. 456, 49 P.2d 203. This court holds plaintiffs' proof, along with Stipulations 8 and 9, was sufficient to establish a prima facie case in manufacturers' products liability.

Atlas also contends the trial court should have directed a verdict in its behalf. We disagree. A motion for directed verdict should not be sustained unless there is an entire absence of proof showing plaintiffs' right to recover. *Sadler v. T. J. Hughes Lumber Co., Inc.,* supra, citing *Austin v. Wilkerson, Inc.,* Okl., 519 P.2d 899. Furthermore, the evidence of both sides to this controversy was conflicting and it is the function of the jury under these circumstances to determine the rights and liabilities of the parties. There being competent evidence which reasonably tends to support the jury verdict for plaintiffs, the verdict will not be disturbed on appeal. *Sunray DX Oil Co. v. Brown,* Okl., 477 P.2d 67; *Miller Construction Co. v. Wenthold,* Okl., 458 P.2d 637.

### II. Hypothetical Questions Based on Facts Not in Evidence

In proof of their case, plaintiffs utilized four expert witnesses. Atlas contends reversible error was created by allowing plaintiffs' experts to answer hypothetical questions based on facts unsupported by the evidence.

Hypothetical questions must be based upon facts as to which there is such evidence that a jury might reasonably find that they are established. *Goodlett v. Williamston,* 179 Okl. 238, 65 P.2d 472. Only the omission of material facts which are essential to the formation of an intelligent opinion on the matter will be fatal to a hypothetical question. *K. P. Construction Co. v. Death of Parrent,* Okl., 562 P.2d 501; *In the Matter of the Death of Deere,* Okl., 557 P.2d 891. However, to preserve the error on appeal, the opposing counsel must specifically object that the question includes facts not in evidence or the error, if any, cannot be raised on appeal. This rule is well stated in 31 Am.Jur.2d Expert and Opinion Evidence, § 64 p. 572–73 (1967), as follows:

> In objecting to a hypothetical question, counsel must be reasonably specific as to the grounds of the objection. Thus, if counsel relies upon the point that the question invades the province of the jury, his objection should call the trial court's attention to such point; a mere general objection to the question, in which there is no intimation that counsel regarded the question as an invasion of the province of the jury, will not suffice. *An objection made on the ground that the question includes facts not in evidence . . . should point out the facts improperly included or omitted . . . .* The purpose of requiring counsel to specify grounds of objection to a hypothetical question is not only to assist the court in ruling on the objection, but also to enable opposing counsel to eliminate objectionable parts or characteristics of the question by changing its form or content.
>
> \* \* \* \* \* \*
>
> *In accordance with the general principle of appellate review, an objection that a hypothetical question omitted material data cannot be raised for the first time on appeal.* (Emphasis added. Footnotes omitted.)

See also 12 O.S.1971, § 424; *Davis v. Town of Cashion,* Okl., 562 P.2d 854; *Cook v. Sheffield,* 181 Okl. 635, 75 P.2d 1101; *Wor-*

*rell v. Allen,* 93 Okl. 3, 219 P. 367; *Fender v. Segro,* 41 Okl. 318, 137 P. 103.

 Rather than give a detail account of the numerous and lengthy hypothetical questions and objections thereto, suffice it to say Atlas' objections went to the expertise of the four witnesses or were merely general objections. In making his general objections, counsel for Atlas, Mr. Rogers, usually used the phrase "Note my (our) objection" with no grounds for the objection recited.

In regard to the expert witness, Robert E. Hebert, proceedings were held at the bench outside the presence of the jury at which time Mr. Rogers objected that Mr. Hebert was not an expert in packaging explosives and should not be allowed to give his opinion on the matter. This objection was overruled. Thereafter, Mr. Rogers objected after a hypothetical question was asked stating:

> Note my objection, Your Honor. . . . I won't be required to give my reason as long as I make my objection; is that sufficient, Your Honor. . . . I want to be sure I save the record. . . . It's agreed *I don't have to give my reason, counsel knows what they are.* (Emphasis added.)

It was agreed to by both parties and the trial judge. However, from reading the transcript, it is apparent this was an extension of the objection of the expertise of Mr. Hebert and was not an objection to the hypothetical question containing facts not in evidence. On the next page of the transcript appears the following language:

> [H]ave I saved my objection as to the opinions of this person as an expert in this field of packaging dynamite caps? It is agreed I have saved my record?
> MR. SELLERS: I have so agreed for this particular witness *and this particular inquiry.* (Emphasis added.)
> THE COURT: All right.

A proper objection was entered as to one hypothetical question asked of Mr. Hebert; however, this particular question was not complained of in Atlas' brief as containing facts not in evidence. Mr. Rogers request-

ed and was allowed a running objection to the expertise of Mr. Ralph Lash. No other objection was made other than "Note my objection."

Atlas failed to properly preserve its objections that the hypothetical questions asked by plaintiffs contained facts not in evidence. Thus, Atlas' second proposition of error is without merit.

### III. Qualifications of Expert Witnesses

 Plaintiffs presented four expert witnesses: Messrs. Grubb, Fearon, Hebert and Lash. Atlas contends these witnesses were not qualified to express the opinions elicited during their examination and as a result Atlas should be granted a new trial under *Magnolia Petroleum Co. v. Norton,* 189 Okl. 252, 116 P.2d 893. The question whether a witness is sufficiently qualified to testify as an expert is a preliminary question to be determined by the trial court and the qualification of a witness as an expert is a matter addressed to the sound discretion of the trial court. *Gold Kist Peanut Growers Ass'n v. Waldman,* Okl., 377 P.2d 807. The Supreme Court in *City of Holdenville v. Griggs,* Okl., 411 P.2d 521, 525, stated:

> In *Arkansas Louisiana Gas Co. v. Maggi,* Okl., 409 P.2d 369, this Court said: "*Qualification of expert witness* is addressed to sound discretion of trial court whose ruling that a witness is sufficiently qualified *will not be disturbed on appeal unless it clearly appears that the discretion has been abused.*" (Emphasis added.)

See also *Continental Oil Co. v. Ryan,* Okl., 392 P.2d 492, citing *Tuck v. Buller,* Okl., 311 P.2d 212. We find no abuse of discretion by the trial court.

 Atlas contends Mr. Fearon was not qualified to testify in regard to fuse caps because he had disassembled an electric cap containing lead azide which is more dangerous than Atlas caps. There are similarities between the two forms of explosives and as an expert in the field of chemical engineering, Mr. Fearon could properly give his

opinion as to the chemical reactions of the three explosives contained within an Atlas cap.

■ Mr. Grubb testified impact could detonate an Atlas cap. The trial court ruled that he was not qualified to testify on the exact amount of force necessary to detonate a cap inasmuch as he had never performed drop tests on Atlas caps. Atlas contends that the trial court, having ruled the witness unqualified, clearly abused its discretion by not granting Atlas' motion to strike and allowing Mr. Grubb's opinion to stand. The trial court only ruled the witness was unqualified as to the exact amount of force necessary to cause detonation. This does not mean that a chemist familiar with explosives could not express an opinion that detonation could occur given sufficient quantity of impact even though he could not testify as to the exact amount of impact needed.

■ Messrs. Hebert and Lash were packaging engineers and Atlas asserts both were not qualified because neither had packaged explosives. However, the evidence shows both men were sufficiently qualified to testify regarding custom packaging. As with all the experts presented by plaintiffs, the weaknesses, if any, in their qualifications were adequately tested by cross-examination and the value of their opinions determined by the jury. *Magnolia Petroleum Co. v. Norton,* supra; 31 Am. Jur.2d Expert and Opinion Evidence § 30 at p. 530 (1967).

The trial court did not abuse its discretion in the qualification of these witnesses as experts.

## IV. Res Gestae Exception

■ Atlas next asserts error on the part of the trial court in overruling its objection to hearsay testimony given by Dr. John D. Hesson, the attending physician when decedent was brought into the emergency room at Drumright Memorial Hospital. The testimony complained of reads as follows:

So I asked him what happened, and *he was moving some dynamite caps and he thought he may have dropped them, and he said they exploded.* I asked was he standing close by and he said right in front of them when they went off . . . . (Emphasis added.)

Atlas asserts the admission of this hearsay evidence is reversible error. Plaintiffs contend the hearsay testimony was admissible under the res gestae exception to the hearsay rule or as a declaration included within the medical history given by the decedent to his treating physician as an aid to diagnosis and treatment.

The Supreme Court in *Silver Seal Products Co. v. Owens,* Okl., 523 P.2d 1091, 1096, reaffirmed in *In re Death of Cleveland,* Okl., 531 P.2d 1396, 1399, defined the res gestae exception, as follows:

In *Piggee [Sand Springs Ry. Co. v. Piggee,* 196 Okl. 136, 163 P.2d 545] we said statements are admissible as part of the res gestae: (1) when made at or near time of the occurrence; (2) when spontaneously made; (3) when provoked or influenced by happening of the accident itself so as to become a part thereof. The *Taylor [Henry Chevrolet Co. v. Taylor,* 188 Okl. 380, 108 P.2d 1024] case declared admission of res gestae statements was justified by spontaneous nature of the statement, which provides sufficient guarantee of trustworthiness to render declarations admissible in evidence. Also see, Wigmore on Evidence 2nd, § 1749, that spontaneous or instinctive utterance made under circumstances calculated to provide a degree of trustworthiness, derive some credit independently of the declaration. We are of the opinion the basis for decision in these cases correctly define principles which govern admissibility of res gestae statements.

See also *Smith v. Munger,* Okl.App., 532 P.2d 1202.

Under the facts of this case, Dr. Hesson's testimony was admissible under the res gestae exception. Decedent was subjected to a violent explosion which tore both his lower legs from his body as well as causing other severe injuries. He was removed by ambulance to the emergency room where the

statement was made to Dr. Hesson. Decedent was conscious at all times but in severe pain and within hours of his death. This court holds the statement by decedent was spontaneous, not deliberative, and was provoked or influenced by the happening of the accident so as to become a part thereof. The disturbing event in this case would so pervade the mental processes of the decedent that it would be unlikely the statement was made in a premeditated, calculating or self-serving sense.

█ The statement was not made at the time of the explosion, but sometime thereafter. (The record is not clear as to the time lapse; however, decedent only survived for three hours after the accident and during this time he was transported to Tulsa where he died.) The time span between the event and the declarant's later expressions is simply an element for consideration, but is not controlling. *Sooner Construction Co. v. Brown,* Okl., 544 P.2d 500; *Sinclair Oil & Gas Co. v. Cheatwood,* Okl., 350 P.2d 944. In *Henry Chevrolet Co. v. Taylor,* 188 Okl. 380, 108 P.2d 1024, 1027, the Supreme Court stated:

> It is sufficient to say that admission of such statements is justified by the spontaneous nature of the statement, which is in itself a sufficient guarantee of the trustworthiness of such declarations to render them admissible, if they are made under the immediate influence of the occurrence to which they relate, and it is not necessary that the declarations be so strictly contemporaneous with the occurrence to which they relate as to be admissible under the so-called "verbal act" doctrine, *the element of time being important only for the purpose of determining whether the declaration was made when the speaker was under the stress of nervous excitement as a result of the occurrence to the extent that the reflective faculties were stilled and the utterance therefore a sincere expression of his actual impressions and belief.* (Emphasis added. Citations omitted.)

See also *Sand Springs Ry. Co. v. Piggee,* 196 Okl. 136, 163 P.2d 545.

█ Decedent's statement falls within the purview of the *Taylor* case. Furthermore, the admissibility of such statements is largely determined by the facts and circumstances of each case and should be left to the discretion of the trial court. *Indian Oil Tool Co. v. Thompson,* Okl., 405 P.2d 104; *Wray v. Garrett,* 185 Okl. 138, 90 P.2d 1050. We find no abuse of discretion on the part of the trial court in admitting the statement.

Inasmuch as the statement made by decedent to Dr. Hesson was properly admissible under the res gestae exception, we need not determine whether the statement would fall within the medical history exception.

## V. Admissibility of Autopsy Report

█ Dr. Leo Lowbeer, the pathologist who performed the autopsy upon decedent, was called to the stand by Atlas to testify decedent was suffering from disease processes at the time of the accident which would have shortened his normal life expectancy. After Dr. Lowbeer testified, Atlas moved to have the autopsy report admitted into evidence. The trial court ruled that the autopsy report was inadmissible and Atlas contends the trial court committed reversible error in refusing to allow the report into evidence. We disagree.

The Supreme Court in its Supplemental Opinion on Rehearing in *Horn v. Sturm,* Okl., 408 P.2d 541, 549–50, recognized that autopsy reports could be made to obtain information useful in defending a damage suit and held they should not be placed in the category of hospital records for evidentiary purposes. Further, the court stated that the report was admissible after proper identification and after the doctor who performed the autopsy was called to identify the report and testify in regard thereto. Although Atlas did follow the procedure outlined in *Sturm,* this does not mean that the contents of the autopsy report did not have to be examined by the trial court to determine if there were statements contained therein which were not admissible.

The autopsy report contained many statements prejudicial to plaintiffs and which had little, if any, probative value on the issue which Atlas sought to establish by introduction of the report, i. e., that decedent suffered from physical conditions which would have shortened his life expectancy. Many other statements were beyond the expertise of a pathologist and, as such, a pathologist's opinion thereon would be inadmissible. Other recitals were pure speculation on the part of Dr. Lowbeer. This court does not deem it necessary to summarize all the statements which would have been inadmissible, rather only a few will be reproduced to illustrate the problem. The report recited:

> [T]he velocity in this case may well have approached 5000 feet per second and more.

> It appears, that any protective clothing of any thickness or resistance would be a great help in eliminating flashburns and minimizing splinter perforations.

> Exactly how the explosion occurred is only a matter of speculation.

> For some reason, he must have put down the two boxes with the loose caps with too much force; or else they slipped slightly out of his hands; or else he slipped on the sandy floor. It appears fairly certain that the explosion occurred first in one of the two boxes with the loose caps, *which perhaps raises the question of handling such boxes even more delicately than necessary even in a tightly packed box.* (Emphasis original.)

> [H]e may have dropped the box during such sudden episode of chestpain; this of course is purely speculative.

> The man could have had a sudden episode of dizziness as is often found in such anatomic conditions and for that reason slipped or dropped the box or boxes. This also is a matter of speculation; but it does raise the question, whether not everybody engaged in such potentially dangerous work, should have periodic thorough physical examination and knowledge of their health status, particularly over the age of 60 . . . .

But it also should be known of anyone in a dangerous occupation whether or not he indulges in alcohol, constantly or periodically. Again this is a matter of sheer conjecture.

Because many of the statements in the autopsy were outside the expertise of Dr. Lowbeer, not probative on the issue which they were offered to show, or speculative, the autopsy report was not admissible in its entirety.

 Where a document contains evidence which is inadmissible, the party offering the document may omit the inadmissible part and offer those portions which are admissible. *New York Life Ins. Co. v. Gibbs,* 176 Okl. 535, 56 P.2d 1179. However, nowhere in the record did Atlas move to have only the admissible portions of the autopsy report introduced into evidence.

 Furthermore, Atlas contends the autopsy report "would have demonstrated that decedent suffered from conditions which would have materially shortened his work and life expectancies." However, Dr. Lowbeer testified concerning his autopsy findings insofar as they bore upon the life expectancy of decedent.

We find no error in the trial court's refusal to admit the autopsy report into evidence.

## VI. Withdrawal of Pre-Trial Stipulation

Atlas contends the trial court committed reversible error by denying Atlas' counsel the right to amend or withdraw a stipulation agreed to by the parties before trial. The stipulation reads as follows:

> 10. That at all times material to this case, Atlas was engaged in the business of manufacturing, packaging and selling fuse caps.

Defendant-Atlas is a Rhode Island corporation. On the fourth day of trial, Atlas tried to withdraw Stipulation Number 10 asserting the Rhode Island corporation had never manufactured, distributed or sold dynamite caps. Rather, a Delaware corporation with the same name was the cap manufacturer. The attorney for the Delaware corporation,

Mr. Quinlin, was present when the pre-trial stipulation was entered into. Both corporations are wholly owned subsidiaries of the Tyler Corporation.

Defendant-Atlas sought to withdraw this stipulation after three full days of a jury trial and the majority of plaintiffs' case had already been presented; plaintiffs had already presented eight of their fourteen witnesses. Defendant-Atlas stated they did not intend to defend on the basis that the wrong corporation was sued and plaintiffs had not attempted to secure evidence on this point and proceeded to trial without concern for the required elements of proof. In denying defendant-Atlas' motion to withdraw, the trial court stated:

THE COURT: Well, I want to ask some questions too.

*First of all, for the record, Mr. Rogers, the Court is shocked that you would come in here on the fourth day after this case was started, and after we spent three and a half hours on stipulations, one of which you now ask the Court to allow you to withdraw. If the Court's memory is right Mr. Quinlin was present with you at all times during this conversation. Is this not correct?*

MR. ROGERS: *That is correct.*

THE COURT: *And he sat here and allowed you to make the stipulations.* I don't know what has happened in this case since I saw you yesterday morning, I have no idea, but the Court certainly takes a dim view of attorneys who want to play games like this with the Court. I am not too receptive to your motion, frankly.

MR. ROGERS: I appreciate that, Your Honor, but I will tell you I did not lay behind a log on it intentionally, it did not come to my attention that this was—

THE COURT: I don't know if you did or not, but I think this is a matter for the Appellate Court to determine. *We are in the middle of trial, and I think you have waived. You have already made opening statement and have told this*

*jury who you are and who you represent, and not one thing has peeped in an opening statement to this jury that you are the wrong corporation.* I think it's—

MR. ROGERS: *No, we did not intend to defend it on that basis.*

THE COURT: Well, I don't care if you did or not, but if you had a defense to it that was the time to do it and not take more of the Court's time with it.

MR. ROGERS: This as I say has come to light insofar as I'm concerned right now.

THE COURT: I think that is something you will have to take care of on down the line. I am going to overrule your request and allow you an exception. (Emphasis added.)

▮ The Supreme Court in *McFarling v. Demco, Inc.*, Okl., 546 P.2d 625, 630–31, discussed standards for allowing the withdrawal of a stipulation. First, there must be a clear showing that the fact stipulated to is untrue. Second, the motion to withdraw the stipulation must be timely made. Second, the motion to withdraw the stipulation must be timely made. The motion to withdraw was not timely. Defendant-Atlas attempted to withdraw the stipulation four days into the jury trial. In *McFarling*, the motion to withdraw was entered a day before the trial date.

▮ The third standard is good cause must be shown for relief. The *McFarling* court considered lack of negligence as a factor showing good cause. We feel lack of negligence is not present in this case. Mr. Quinlin, the attorney for the Delaware corporation, was present when the stipulation was entered into. We believe with due diligence the fact Defendant-Atlas did or did not manufacture caps could have been ascertained by defendant's counsel prior to agreeing to the stipulation. There are no grounds for relief where lack of knowledge is due to the failure to exercise due diligence. 83 C.J.S. Stipulations § 35b(2) at p. 91 (1953); 73 Am.Jur.2d Stipulations § 14 at p. 551 (1974).

Fourth, the fact must be one of material character which changes the rights of the parties. Fifth, the opposing party must not have detrimentally relied and changed his position. The *McFarling* court considered this to be the crucial question. Although we find no specific ruling by the trial court upon this question, the evidence sufficiently reveals plaintiffs did detrimentally rely on the stipulation. In view of the stipulation, plaintiffs had not secured evidence on the issue and proceeded to trial under the assumption that the party sued was the manufacturer. Plaintiffs had already presented much of their case to the jury when the motion to withdraw was made. The sixth factor is that the failure to allow the stipulation will result in manifest injustice to one of the parties. The last consideration is whether the trial court abused its discretion. Under the facts and circumstances of this case, we can not say the trial court abused its discretion.

Accordingly, the trial court's refusal to allow the withdrawal of Stipulation Number 10 is affirmed.

## VII. Excessive Verdict

Atlas contends the verdict was excessive due to improper instructions and passion, prejudice and bias on the part of the jury. Atlas complains of Instructions 17 and 18; however, both adequately describe the various recoverable items and we find no prejudicial error contained within either. A verdict will not be interfered with by an appellate court where the issues have been fairly submitted under proper instructions. *Hampton v. Danks*, Okl., 387 P.2d 609. A reviewing court has no right to place limitations upon the amount of damages returned by the jury unless it is convinced that the amount of recovery bears no relation whatever to the evidence, or that it was induced by bias or prejudice on the part of the jury. *Tulsa City Lines v. Geiger*, Okl., 275 P.2d 325. See also *First Nat'l Bank of Amarillo v. LaJoie*, Okl., 537 P.2d 1207; *Vickers v. Ittner*, Okl., 418 P.2d 700.

The jury returned the following verdict:

| | |
|---|---|
| Pain and Suffering | $ 50,000.00 |
| Medical | 504.20 |
| Widow | 200,000.00 |
| Iris (Decedent's daughter) | 10,000.00 |
| Joyce (Decedent's daughter) | 10,000.00 |
| Funeral | 1,541.08 |
| Total | $272,045.28 |

There is no dispute as to the amounts awarded for the funeral expenses and medical bills.

In regard to the $50,000.00 pain and suffering award, Atlas contends the jury awarding this sum shows passion and prejudice because the pain and suffering "admittedly lasted no more than two or three hours." There is no fixed rule whereby damages for pain and suffering alone can be measured. Compensation for pain and suffering rests in the sound discretion of the jury, because "there is no 'market where pain and suffering are bought and sold, nor any standard by which compensation for it can be definitely ascertained, or the amount actually endured determined.'" *Denco Bus Lines v. Hargis*, 204 Okl. 339, 229 P.2d 560, 563, quoting *St. Louis S. W. R. Co. v. Kendall*, 114 Ark. 224, 169 S.W. 822, 824. See also *Chicago, Rock Island & Pacific R. R. Co. v. Hawes*, Okl., 424 P.2d 6; *Marathon Battery Co. v. Kilpatrick*, Okl., 418 P.2d 900.

The injuries decedent received due to the explosion included multiple blast wounds to the face, chest and abdomen, both of his lower legs had been blown away, his right hand was gone with near amputation of his left hand and both eyes were severely injured. According to the ambulance driver, decedent was conscious during the ride to the emergency room and during the trip to Tulsa. The driver believed decedent was suffering quite a lot of pain. The treating physician at the emergency room, Dr. Hesson, testified decedent was conscious and in pain. Dr. Hesson could not give him adequate pain medication. Because decedent's arms had been blown apart, Dr. Hesson was not able to ascertain a blood pressure. Although morphine or

demerol would normally have been used, Dr. Hesson only administered Talwin, which only "takes the edge off" without lowering blood pressure.

We find that the award for pain and suffering was adequately supported by the evidence and not induced by bias or prejudice on the part of the jury.

■ Vivian Lauderdale, the widow of decedent, received an award of $200,000.00 for pecuniary loss and loss of services. Mrs. Lauderdale is 56 years of age and was married to decedent 32 and a half years. Before he retired, decedent would have earned approximately $60,000. Mrs. Lauderdale was also entitled to be compensated for loss of consortium, including loss of advice, comfort, companionship and services. The jury was in a better position to determine the dollar amount of Mrs. Lauderdale's pecuniary loss. We feel the evidence was adequate to support their verdict. Although Dr. Lowbeer testified decedent would have had a shorter than normal life expectancy, Dr. Hesson stated the findings of Dr. Lowbeer were not unusual and decedent could have survived an average life span with reasonable medical care. The jury's duty is to determine facts from conflicting evidence. This court finds that the award to Mrs. Lauderdale was not excessive.

■ The two married adult daughters of decedent were awarded $10,000 each. Adult children can recover in wrongful death actions. The correct measure of damages is the pecuniary loss suffered by reason of the death of their father. *Belford v. Allen*, 183 Okl. 256, 80 P.2d 671; *Gypsy Oil Co. v. Green*, 82 Okl. 147, 198 P. 851; *Pressley v. Incorporated Town of Sallisaw*, 54 Okl. 747, 154 P. 660. Pecuniary loss was discussed in *Rogers v. Worthan*, Okl., 465 P.2d 431, 438–39, as follows:

> Recovery in a wrongful death action is not contingent upon a showing that the claimant had been dependent, to some extent, upon the deceased. Even great wealth would not, of itself, preclude the recovery of damages for any pecuniary benefits which a claimant might, reasonably, have expected to receive if the deceased had lived.

> *The basic factor controlling recovery* in such an action is not whether the claimant had been dependent upon the deceased for support, but *is whether, in the circumstances disclosed by the evidence in the particular case, it can reasonably be said that there was a probability, or a reasonable expectancy on the part of the claimant, that the decedent, except for his death, would have contributed money, aid, services, or anything else that would have a pecuniary value to the claimant.* (Emphasis added.)

■ Both daughters testified as to services, aid and money provided by decedent, such as wedding, birthday and Christmas gifts, assistance in moving, arranging for burial of a grandchild, paying for groceries, providing family barbeques and the boat for family recreation, giving business guidance, welding services, helping with household repairs, babysitting, co-signing notes and loaning money which was never asked to be repaid. We feel sufficient evidence existed that decedent contributed money, aid and services with pecuniary value to the daughters. On appeal, it matters not that the appellate court might or might not have reached a different conclusion as to the amount of damages suffered and the only question which is presented is whether there is any competent evidence to sustain the verdict. *Battles v. Janzen*, Okl., 325 P.2d 444.

■ The jury was properly instructed as to the measure of damages, there was competent evidence reasonably tending to support the verdict, and it does not appear from the record that the jury was swayed by passion or prejudice. Hence, the verdict will not be disturbed on appeal. *Belford v. Allen*, supra.

## VIII. Use of Prepared Board During Closing Argument

During closing argument, plaintiffs' attorney, Mr. Sellers, produced a board on which figures had been placed before trial. The board contained a damage analysis used as an aid to closing argument. Ac-

cording to plaintiffs' brief, the items on the board were covered from view by masking tape until actually referred to by Mr. Sellers during his argument. Atlas asserts the use of this board was improper and resulted in an excessive verdict.

 In regard to the use of blackboards during closing argument, the Supreme Court in *Shuck v. Cook*, Okl., 494 P.2d 306, 312, stated:

> [W]e adhere to the rule that to grant or refuse the request is within the sound discretion of the trial court who is in the best position to know how error may creep in.

The rule is the same whether counsel places figures on the blackboard prior to or during his argument to the jury. *Fields v. Volkswagen of America, Inc.*, Okl., 555 P.2d 48, 62. We find, under this record, no abuse of discretion.

Furthermore, in *Missouri-Kansas-Texas Railroad Co. v. Jones*, Okl., 354 P.2d 415, 420, the Supreme Court stated another test to determine whether the use of a blackboard was prejudicial to the defendant was whether it resulted in an excessive verdict. See also *Kansas City Southern Railway Co. v. Black*, Okl., 395 P.2d 416, 419. We have already determined, in part VII of this opinion, that the verdict was not excessive.

Atlas asserts the trial court should have given a cautionary instruction or admonished the jury that the board was not evidence. However, neither were requested by Atlas.

We find no error in the trial court's permitting plaintiffs to utilize a prepared board during closing argument.

### IX. Prejudgment Interest

Atlas contends in its last proposition of error that the trial court should not have awarded prejudgment interest. Prejudgment interest is allowable under 12 O.S. 1971, § 727, which provides in part:

> 2. When a verdict for damages by reason of personal injuries is accepted by the trial court, the court in rendering judgment shall add interest on said ver-

dict at the rate of six percent (6%) per annum from the date the suit was commenced to date of verdict.

The trial court awarded prejudgment interest in the amount of $53,987.97. The issue is whether prejudgment interest should be awarded under a survival or wrongful death cause of action.

In *Allen v. Hartford Accident & Indemnity Co.*, 190 Okl. 313, 123 P.2d 252, 253, the Supreme Court stated: "A plaintiff in an action for damages for negligence, such as one for wrongful death, may not recover interest prior to the entry of judgment." *Allen* is not controlling inasmuch as it was decided prior to the adoption of Section 727 allowing prejudgment interest.

 Plaintiffs' first cause of action was a survivorship action under 12 O.S. 1971, § 1051, which provides, in part:

> In addition to the causes of action which survive at common law, causes of action . . . for an injury to the person . . . shall also survive; and the action may be brought, notwithstanding the death of the person entitled or liable to the same.

Because causes of action for personal injuries survive under Section 1051, prejudgment interest awarded under Section 727 "when a verdict for damages by reason of personal injuries is accepted" is properly allowable. Indeed, Atlas does not contend prejudgment interest can not be awarded under a survivorship action. Rather, Atlas contends under *Bossert v. Douglas*, Okl. App., 557 P.2d 1164, the prejudgment interest must be included in the instructions to the jury and merged in the final verdict. It can not be computed and added to the jury's verdict. We find this to be an erroneous interpretation of *Bossert*. Furthermore, the statute specifically requires the court to add the interest onto the verdict.

 The remaining issue is whether prejudgment interest should be allowed in a wrongful death action. Oklahoma's wrongful death statute is codified at 12 O.S.1971, § 1053, which provides:

> When the death of one is caused by the wrongful act or omission of another, the

personal representative of the former may maintain an action therefor against the latter, or his personal representative if he is also deceased, *if the former might have maintained an action had he lived,* against the latter, or his representative, *for an injury for the same act or omission.* The action must be commenced within two years. The damages must inure to the exclusive benefit of the surviving spouse and children, if any, or next of kin; to be distributed in the same manner as personal property of the deceased. (Emphasis added.)

If decedent had lived, he could maintained an action for his personal injuries and recovered prejudgment interest.

In addition, the prejudgment interest statute allows the interest when a *verdict is returned for "damages by reason of personal injuries."* The language of the statute is broad enough to include a recovery for wrongful death by reason of personal injuries when the action is, of necessity, brought by someone other than the person who sustained the injuries. Colorado allows prejudgment interest in wrongful death actions. Although the Colorado prejudgment interest statute contains the language "whether such injury shall have resulted fatally or otherwise," the Colorado Supreme Court in *American Ins. Co. v. Naylor,* 103 Colo. 461, 87 P.2d 260, 264–65 (1939) construed the phrase "in all actions brought to recover damages for personal injuries" as follows:

> There is, of course, no difference in character between fatal and nonfatal injuries. The difference is only in degree, from which it follows that the title of the act of which the foregoing section is a part, "An Act providing for interest on damages for personal injuries," Laws 1911, p. 296, is sufficient to cover actions for damages resulting from both fatal and nonfatal injuries. If the injuries result fatally the person bringing the action will of necessity be some one other than the deceased, which is the situation presented by the cases before us. We think it might well be said that a person, as the plaintiff here, who has lost the society,

companionship and services of his wife and has expended money in an attempt to minimize or prevent such loss, has himself sustained a personal injury. We think it is not necessary however so to hold in order to bring the instant cases within the statute. In *Mulvey v. Boston,* 197 Mass. 178, 83 N.E. 402, 14 Ann.Cas. 349, the court, referring to a statute of limitations, said: "The language of the statute is not restricted to actions for injuries to the person of the plaintiff, and we think it is broad enough to include all actions of tort founded on injuries to the person of any one in such relations to the plaintiff that the injury causes him damage." Webster's International Dictionary gives as one definition of the word "for," and the one we think applicable to the construction of the statute before us, the following: "Indicating the cause, motive or occasion of an act, state or condition; hence, because of; on account of; in consequence of; as the effect of; for the sake of." We think the actions brought to recover damages for each of these torts were because of, on account of, and in consequence of personal injuries sustained by the plaintiff's wife of such extent that they finally resulted fatally. The cross assignments of error therefore must be sustained. The reasoning of the courts in opinions rendered in the following cases, though not involving statutes and situations identical with those under consideration in the cases at bar, is in point and supports the conclusion we have reached and expressed herein: *Mulvey v. Boston,* supra; *Brahan v. Meridian Light & Ry. Co.,* 121 Miss. 269, 83 So. 467; *Bixby v. Sioux City,* 184 Iowa 89, 164 N.W. 641; *Crapo v. Syracuse,* 183 N.Y. 395, 76 N.E. 465; *Titman v. Mayor, etc., of City of New York,* 57 Hun 469, 10 N.Y.S. 689; *Price v. National Surety Co.,* 221 App.Div. 56, 222 N.Y.S. 437; *Crapo v. Syracuse,* 98 App.Div. 376, 90 N.Y.S. 553; *International & G. N. Ry. Co. v. Edmundson,* Tex.Civ.App., 185 S.W. 402.

See also *Hindel v. State Farm Mut. Auto Ins. Co.,* 97 F.2d 777 (7th Cir. 1938) (Statute

which provided "for the benefit of all persons who may suffer personal injuries" construed to cover an injury which results in death.); *Harris v. Elliott*, 277 Ala. 421, 171 So.2d 237 (1965), citing *Alabama Great Southern R. Co. v. Ambrose*, 163 Ala. 220, 50 So. 1030 (1909) (An action for wrongful death is an action for personal injuries.); *Wetz v. Thorpe*, 215 N.W.2d 350 (Iowa 1974) (Allowance of prejudgment interest in wrongful death is essential to accomplish full justice.); *Brahan v. Meridian Light & Ry. Co.*, 121 Miss. 269, 83 So. 467 (1919) (The term personal injuries construed to mean all actions of tort founded on injuries to the person and does not refer to only those actions brought by the person receiving the physical impact.); *Weiman v. Ippolito*, 129 N.J.Super. 578, 324 A.2d 582 (1974) (Prejudgment interest allowable in wrongful death action when statute stated the court shall "in tort actions" include prejudgment interest.); 43A C.J.S. Injury at p. 770 (1978) (The word injuries includes all injuries, whether fatal or not.).

We therefore hold that the trial court properly awarded prejudgment interest on the amounts recovered under both the survivorship and wrongful death causes of action. In view of the findings of this court on Atlas' nine propositions of error, the judgment of the trial court is accordingly affirmed in all respects.

AFFIRMED.

ROMANG and REYNOLDS, JJ., concur.